RICHMOND *et al.* v. THE DUBUQUE & SIOUX CITY R. R. Co.
and THE ILLINOIS CENTRAL R. R. Co.

1. **Contract: CONSTRUCTION: RAILROAD COMPANY.** The Dubuque and Sioux City Railroad company and an elevator company at the city of Dubuque, entered into an agreement, containing among others the following stipulation: That the elevator company would erect a building suitable "for receiving, storing, delivering and handling all grain that shall be received by the *cars of said railroad company not otherwise consigned.*" Subsequently to this they made a contract supplemental to the first, in which it was stipulated that the elevator company should "receive and discharge for the Dubuque & Sioux City Railroad company *all through grain* at one cent a bushel," etc., and that the elevator should have the handling of all *through grain* at that price per bushel. In an action to recover damages against the railroad company for its refusal to give the elevator the handling of grain according to the contract, it was *held,*

First. That the original and supplemental agreement were to be considered together as forming one contract.

Second. That the words "for receiving, etc., all grain that shall be received by the cars of said railroad company," contained in the original agreement, and the words "receive and discharge for the Dubuque and Sioux City Railroad company," contained in the supplemental agreement, did not limit the contract to grain received or shipped in the cars *owned* by said railroad company, but extended to all grain shipped in cars *used* by it in transporting grain over its road, whether belonging to it or to other companies with whom it might have running arrangements.

Third. That the words "all through grain," contained in the supplemental agreement, did not mean grain shipped through merely to the end of the line of said railroad company, but all grain consigned through Dubuque to some point beyond, by the terms of shipment.

2. —— CONTRACTS AGAINST PUBLIC POLICY: MONOPOLIES. The power of courts to declare a contract void as being against public policy, is a delicate and undefined one, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt. It was accordingly held that the contract in the present case was not inoperative as being in contravention of public policy, on the ground that it gave to the elevator company a monopoly of handling all the through grain transported over defendant's road.

3. —— MEASURE OF DAMAGES. It was further held, that the measure of damages in the present case would be the difference between the cost of handling the grain that the plaintiffs were, under the contract, entitled to handle, and the price stipulated to be paid therefor; but that if it was shown that the plaintiffs, in order to handle the grain that was actually furnished them by the railroad company, were required to and did have the hands and power sufficient to handle, without further expense, the grain which the defendant wrongfully refused to let them handle, then the plaintiff might recover the price per bushel stipulated for handling in the contract, since in such case the cost of the additional handling would be nothing.

*Appeal from Dubuque District Court.*

MONDAY, DECEMBER 14.

ON the 22d of August, A. D. 1860, the Dubuque and Sioux City Railroad company, and the Dubuque Elevator company (another corporation) made a contract in writing, of which the following is a copy, viz. : " Contract between the Dubuque and Sioux City Railroad company, and the Dubuque Elevator company, made this 22d day of August, 1860.

" Said railroad company leases to the Dubuque Elevator company, in consideration of the covenants and agreements hereinafter set forth, a piece of ground for the erection of a grain elevator and grain storehouse, for the term of fifteen years from the date hereof.

" Said land is to be mutually selected by the parties hereto, on the depot lands of said railway company, in Dubuque, and to be sixty-five feet square or thereabouts, but liable to be increased in case the business of the country warrants it, as hereinafter mentioned.

" The Dubuque Elevator company shall have the exclusive possession of said land so long as they comply with the terms of this lease.

" The Dubuque Elevator company covenants and agrees:

" 1. That they will erect a building suitable for receiving, storing, delivering and handling all grain that shall be received by the cars of said railroad company, *not otherwise consigned;* and that they will from time to time make such additions thereto as the amount of the business to be done may require.

" 2. That they will pay said railroad company the yearly rent of five dollars.

" 3. That they will not charge for receiving, storing, delivering and handling grain higher rates than are charged in the same business at Chicago, Illinois; but the business shall be conducted upon the same terms as may be usually charged at Chicago from time to time.

" 4. That, at the expiration of fifteen years, the Dubuque Elevator company will, at the option of said railroad company, accept of and enter into a renewal of this for another fifteen years, exactly on the same terms as this lease, or accept in full payment for their buildings, machinery and property necessary for the receiving, storage, delivery and handling of grain, and the conducting of such business, the amount for which the same by an appraisal may be ascertained to be worth.

" The Dubuque and Sioux City Railroad company covenant and agree to maintain the Dubuque Elevator company in the peaceable possession of said premises so long as they abide by and perform the covenants of this lease; and further covenant that they will not erect a similar building, namely, a building for the receiving, storing, delivering and handling of grain in the city of Dubuque; and further covenant that they will not grant or lease to any other party or parties during this lease, the right to erect any such building in Dubuque.

" And it is understood and agreed that this instrument

is entered into by said parties, in their own behalf and in behalf of their legal representatives respectively, and binding on them and their legal representatives, as fully and effectually as if expressly so written in the covenanting clauses.

"Witness the hands of the officers of the companies, and the corporate seal," etc.

Subsequently, they made another contract, in writing, a copy of which is as follows, viz.:

"Supplement to the contract between the Dubuque Elevator company, and the Dubuque and Sioux City Railroad company, which was entered into 22d August, 1860.

"The Dubuque Elevator company agree to receive and discharge for the Dubuque and Sioux City Railroad company, all through grain at one cent a bushel, and shall make no charge for storage unless the grain is in store more than ten days. In case the grain is held in store for the railroad company for more than ten days, the Dubuque Elevator shall have one cent a bushel for the first ten days (or fraction of ten days), following the ten days without charge, and shall have one-half cent a bushel for every additional ten days or fraction of ten days.

"And the Dubuque and Sioux City Railroad company agree that the Dubuque Elevator company shall have the handling of all through grain, and agree to pay the Dubuque Elevator company, one cent a bushel for receiving and discharging thereof, as aforesaid. And agree to pay for storage, as aforesaid, when the same exceeds ten days.

"This agreement to continue until the expiration of the contract to which it is supplementary.

"Witness the hands of the officers of the companies, and the corporate seal of the Dubuque and Sioux City Railroad company, January 2, 1861."

The plaintiffs have succeeded to the rights and obliga-

tions of the Dubuque Elevator company; and the defendant the Illinois Central Railroad company, has leased the road and appurtenances of its co-defendant, and expressly assumed the contracts made by it with the Dubuque Elevator company. The Illinois Central Railroad company entered into possession of the leased property, on the first day of October, 1867, and shortly thereafter commenced the transfer of grain, etc., across the Mississippi river, in its cars, and from that time up to the 23d day of January, 1868, when this action was commenced, only a portion of the grain received at Dubuque over the defendant's road, was handled by the elevator.

This action is brought to recover damages for the failure of the defendants to give to the plaintiffs' the handling of the grain, according to the stipulations of the foregoing contract and supplement. The cause was tried to a jury, and resulted in a verdict for plaintiffs for $3,912. The defendants moved to set aside the verdict for the various reasons assigned, and among others, that it was excessive. The court held that the jury had allowed for handling certain grain not within the construction of the contracts, as given to them by the court, to the amount of $465.38, and ordered that a new trial be granted, unless the plaintiffs should rebate that amount. The plaintiffs excepted to the ruling, but made the rebatement, and thereupon judgment was rendered for the plaintiffs for the sum of $3,446.82, and costs.

During the progress of the trial, both parties excepted to certain rulings of the court, and both have appealed to this court, and assigned numerous errors; only those which have been insisted and relied upon in argument, are discussed and decided in the following opinion, in which the further necessary facts are also stated.

*Platt Smith* and *Griffith & Knight* for the plaintiffs.

*W. Weigley* and *Allison, Crane & Rood* for the defendants.

COLE, J. — The real point in controversy between the parties in this case is as to the construction of the original and supplemental contracts set forth in the foregoing statement. The plaintiffs claim the right to handle all grain brought in on the Dubuque & Sioux City railroad, and not designed for actual consumption or manufacture at Dubuque. While the defendants claim that the plaintiffs are entitled to handle only such grain as is not otherwise consigned, than to their elevator.

*1. CONTRACT: construction: railroad company.*

Upon the trial, the court, to aid in the construction of the contracts, admitted testimony offered by the plaintiffs, tending to show the facts and circumstances surrounding the parties at the time the contracts were made; and also to show the practice of the parties thereunder for several years, as illustrative of the construction they mutually placed thereon. This testimony, however, was not permitted to go to the jury, but was expressly excluded from them. In our view, the contracts would receive the same construction either with or without the testimony; or, in other words, the testimony does not affect the true construction, and therefore no prejudice has resulted to either party by its admission, and the errors assigned thereon by the defendants cannot be sustained.

The Dubuque & Sioux City railroad has its eastern terminus on the west bank of the Mississippi river, in the city of Dubuque, and extends thence westward. At Farley, a town about twenty miles west from Dubuque, the Dubuque Southwestern railroad forms a junction with the Dubuque & Sioux City railroad, and runs south-westerly therefrom. The elevator building was erected on the lands of the Dubuque & Sioux City Rail-

road company, at its eastern terminus on the bank of the river. The elevator is mainly a means or instrumentality for loading and unloading grain into and out of cars, boats, barges or other vehicles, and incidentally for storing the same; it is in no just sense a connecting line of transit or connecting common carrier to the defendants' lines.

The original contract between the Dubuque & Sioux City Railroad company, and the Dubuque Elevator company contains, in substance, these respective stipulations or covenants: By the railroad company: first, to lease the ground; second, to secure the elevator company in the exclusive and peaceable possession of the same, so long as they abide by, and perform their covenants of the lease; third, that they will not erect a similar building; and fourth, that they will not lease to any other party for the erection of such a building. By the elevator company: first, that they will erect an elevator building for handling all grain received by the cars of the railroad company, not otherwise consigned, and add to it as business may require; second, that they will pay five dollars yearly rent; third, that they will conduct business upon the same terms, and charge the same rates as is done in Chicago from time to time; fourth, that they will, at the option of the railroad company, accept a renewal of the lease for fifteen years, or the appraised value of their building and appurtenances.

From this analysis of the contract, it is readily seen that the railroad company did not bind itself to furnish any grain whatever to the elevator company; nor did the elevator company bind itself to make provision for handling any grain except that "not otherwise consigned." It was therefore apparent, when the supplemental contract was made, that the elevator company had a large sum invested in a building, fixtures, and appurtenances,

on the land of another, without any actual guarantee of any business whatever.   And, on the other hand, the railroad company had their grounds occupied by another corporation which was under no obligation to provide buildings and fixtures for handling any grain for them, nor was there any definite price fixed for the handling of the grain they were bound to handle.   It is not strange, therefore, that the parties should mutually wish further respective covenants.

Four months and two days after the original contract was made, we accordingly find the parties making a supplement to their manifestly defective original contract. In view of the shortness of the time, and the magnitude of the structure, it is highly probable that the elevator had been completely ready for operation only a very short time prior to the making of the supplemental contract. By the supplement the parties respectively stipulated as follows : The elevator company : first, that they would receive and discharge all through grain, — that is, in addition to or instead of their original covenant to provide buildings, etc., for handling all grain not otherwise consigned, they now agree to provide buildings, etc., and to receive and discharge all through grain ; second, that they will only charge one cent a bushel for handling, nothing for storage for first ten days, one cent a bushel for the next ten or fraction thereof, and one-half cent for every additional ten days or fraction thereof.   The railroad company : first, that the elevator shall have the handling of all through grain ; second, that the railroad company would pay the stipulated price for handling and storage. And they mutually agree that the supplement shall continue in force as long as the original contract.

Taking this analysis, and the rule of construction, about which the opposing counsel do not differ, that the whole of the covenants or instruments shall be taken and con-

strued together, we have no difficulty so far, and there remain but two further points for consideration. First, what is meant by the term, "the cars of said railroad company," contained in the first covenant of the elevator company in the original contract; and the term "the Dubuque and Sioux City Railroad company," in the first clause of the supplement? Does the first mean the cars owned by said railroad company, or the cars used by them in transporting grain over their road? To hold that it meant the former, would be giving the words a narrow, forced, and unusual construction, as well as placing it in the power of the company to entirely evade their covenant, by using the hired or borrowed cars of another company. While, to hold that it means the latter, to wit, the cars used by them in transporting the grain over their road, is giving the words their ordinary meaning, and also giving prominence to the subject-matter of the contract, to wit, the grain, rather than the vehicle in which it may be carried.

So, also, as to the term quoted last above from the supplement, the grain is to be received and discharged "for the Dubuque and Sioux City Railroad company." It can make no difference as to whose cars the grain may be transported in, whether it is in the cars owned by that company, or by one of the railroad corporations with which it may connect or have running arrangements.

Secondly, what is meant by "all through grain"? It is said that the word "through" may have, in this connection, three different meanings, to wit: through to the end of the line of the Dubuque and Sioux City railroad, which is simply *to* Dubuque; or, through Dubuque to some other point beyond, ultimately, although consigned to Dubuque for the present; or, through Dubuque to some point beyond, by the terms of shipment. Taking the term in its most natural signification as applied to

the subject matter and purpose of the contract, we have no difficulty in holding that it means the latter. To hold that it meant the first, as stated, would be to give no meaning at all to the word "through," for it would, of necessity mean *all grain* arriving at Dubuque, and the term "all grain," would express the idea as completely as "all through grain." To hold that it meant the second, as stated above, would involve the parties in endless controversies as to the identity of grain, and the subject matter of the contract would always be in more or less doubt. But it is also clear, beyond question, that it would not be competent for the railroad company to have the grain consigned to consignees in Dubuque, for the purpose of evading the contract, or for any other than an actual and legitimate commercial purpose in the ordinary course of business.

We are now prepared to state succinctly the construction to be given to the whole contract. The plaintiffs are entitled to handle in their elevator all grain coming over defendants' railroad, whether in its own cars or the cars of the Dubuque Southwestern railroad, or any other connecting road, primarily shipped for points beyond or other than Dubuque, and to have therefor the price stipulated from the defendants.

This is the construction given to the contract by the District Court, except that court held that the plaintiffs were not entitled to handle the grain coming over the road from and in the cars of the Dubuque Southwestern railroad. Thus holding, the District Court required the plaintiffs to rebate from the verdict the amount manifestly allowed by the jury for grain transported by defendants over their road in the cars of the Dubuque Southwestern railroad. The plaintiffs duly excepted to such holding and ruling, and appealed therefrom, assigning the same as error. The plaintiffs' appeal is, therefore, sus-

tained to this extent, and the judgment will be corrected accordingly.

But it is argued by defendants' counsel that this construction of the contract will render it void, by reason of being, when thus construed, in contravention of sound public policy; that sound public policy, as also the law maintaining and enforcing it, abhors a monopoly; and that the construction, as above set forth, gives to the elevator a monopoly of handling all the through grain brought on the road of defendants. Without deciding what the law is upon the question of monopoly, suppose it to be conceded as claimed, what then? The defendants, as common carriers of grain over their line of road, were bound to unload it from their cars when they reached the terminus of the line on the bank of the river which there formed a barrier to their being run further. To unload the grain with ordinary shovels and manual labor was necessarily tedious, expensive and wasteful. The manner or means of discharging the grain was legitimately and properly within the discretion of the carrier, and the shipper or consignor could not rightfully control the carrier in that particular (provided no prejudice resulted to him) any more than he could control as to the structure of the steam engine, or the fuel to be used in the hauling of the cars over the road. While the consignor has, most unquestionably, the right to direct and control as to which of the two or more connecting lines shall receive his consignment, yet that is a very different question from controlling the manner in which the carrier shall perform his undertaking. And if the carrier shall make his contract with one laborer, or with a certain number of laborers, whereby, in consideration of having the unloading of all the grain, he or they will do it at a certain price, such contract could hardly be called the giving of a monopoly. Whether the employee

*2. —— contracts against public policy: monopolies.*

Richmond v. Dubuque & Sioux City R. R. Co.

be one or many laborers, or be the proprietors of an elevator, can make no difference upon the question of monopoly. But further than this, the power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt. The fact, that, by reason of the development of the country, or the great improvement of the means of transit, or other cause, a contract becomes a hard or profitless one, will not justify a court in absolving either party from its performance. Courts simply declare and enforce the law as applied to the contract of the parties; they do not grant indulgences, or absolve from valid obligations.

Upon the subject of damages, the plaintiffs' counsel asked the court to instruct the jury, that if the defend-

3. —— measure of damages. ants, without any default upon the part of plaintiffs, passed any grain through Dubuque, coming in over their road, without allowing the plaintiffs' elevator to handle the same, then the measure of damages would be one cent for every bushel of grain thus passed. This the court refused to give, and rightly so, and plaintiffs excepted. The defendants asked the following instruction : " That by the terms of the contract, the plaintiffs are entitled to one cent a bushel for all grain which they handle; but this will not be the measure of damages as to grain shipped past their elevator, and for which they are entitled to damages, but as to such grain the plaintiffs can only recover such damages as they have proved; and having offered no evidence of damages except the contract, then they are only entitled to nominal damages, or one cent." This the court also refused to give; doubtless because of the concluding paragraph asserting that there was no evidence on that subject. The transcript before us contains some evidence, but it is not

certified as containing all the evidence, and hence we cannot determine that the court erred in refusing the instruction, even if it be conceded to contain the correct rule of law.

The court then gave to the jury its instructions upon the subject of damages, to so much of which as here follows the defendant duly excepted: "If the plaintiffs were prepared to handle the grain, and had hands ready for that purpose, and power in operation, so that they could have handled the grain they were entitled to, without any additional cost over and above what they were at in keeping themselves in readiness to handle the same, according to contract, then the price fixed by the contract might be a fair criterion of the damages; but, if not, then so much from such price should be deducted as would cover the actual cost of such handling by the plaintiffs, the balance of the price fixed, over such actual cost, being the damages."

As above remarked, we have not all the evidence before us, and cannot, therefore, know what evidence this instruction was based upon. There is, however, in the transcript, evidence tending to show that during the time the defendants were running the grain in controversy through, without using the elevator, they were also using the elevator for other grain not in controversy, and it also appears that the plaintiffs were at all times prepared and in readiness to pass the grain in controversy through the elevator. But, regardless of this, since we have not all the evidence before us, we would be bound, nothing appearing to the contrary, to presume that there was proper and sufficient evidence upon which to base the instruction given by the court.

Most unquestionably, the true measure of damages in this case, is the difference between the cost of handling the grain in the elevator and the price stipulated to be

paid therefor. And this rule was, in substance, expressed in the latter part of the instruction given by the court. As to the first part of that instruction, it expresses also the true rule as applicable to the hypothesis of fact contained in it. If the plaintiffs, in order to handle the grain which was actually furnished them, were required to and did have the hands and the power employed, which could, without further expense, also have done the additional handling of the grain which defendants wrongfully refused to allow them to handle, then they ought to recover the full price for the grain thus refused them. For then they recover according to the rule above stated, to wit, the difference between the cost of handling and the price; since, upon the hypothesis stated, the cost of handling would be nothing. And the jury have so found.

There was no error, therefore, in the instructions upon the measure of damages.

As to the other instructions given and refused, they were based upon the construction given the contract as hereinbefore shown, and the errors assigned thereon have been disposed of in settling the true construction of the contract. It follows that there was no error to defendant's prejudice, and their appeal is, therefore, not sustained.

As to plaintiff's appeal the judgment is

Reversed.

As to defendant's appeal, the judgment is

Affirmed.

DILLON, Ch. J.—In concurring, after some hesitation and doubt, in that portion of the opinion relating to the instructions given and refused as to the rule of damages, I desire to add that I do so in view of the state of the record, and to say that I do not understand the opinion as holding that the rule therein stated would necessarily be the true rule under a different state of facts. For instance,

were the plaintiffs notified by the defendants, that, by reason of a bridge over the river, or by reason of their preferring to transfer the grain across the river directly in the cars by running the latter to boats, they would hereafter furnish the plaintiffs with no more grain under the contract, the latter would not then be justified, as I think, in keeping a force of hands on pay, doing nothing, during the remainder of the contract term, with a view to claim one cent per bushel for each and every bushel of grain that might, during that period, pass over the defendants' road. In such a case it might be the right, if not the duty, of the plaintiffs to declare as for a total breach of the contract, and recover in one action damages for the whole contract period. And in such a case, and indeed in any case, it would be the duty of the plaintiffs not to adopt or pursue a course which would make the damages unnecessarily large.

If, without such a notice, there shall be a distinct breach of the contract by the defendant, whether the plaintiffs may bring a distinct action for each car load of grain that they are wrongfully prevented from handling, or whether they can sue but once, and in that suit must claim damages for the entire space of time covered by the contract, is also a question not involved even incidentally in the present appeal, and upon which, as I understand, no opinion of the court is given or is to be inferred.