James F. MARTIN and Georgeann J. Martin, Appellees,

v.

PEOPLES MUTUAL SAVINGS AND LOAN ASSOCIATION, Appellant.

No. 66054.

Supreme Court of Iowa.

May 19, 1982.

George Keith of Martin, Keith & Pederson, Waterloo, and Jon Fister of Beecher, Beecher, Holmes & Rathert, Waterloo, for appellant.

Robert L. Rausch of Cutler & Rausch, Waterloo, for appellees.

Thomas J. Miller, Atty. Gen., and Steven G. Norby, Asst. Atty. Gen., for amicus curiae State of Iowa.

George Cosson, General Counsel, Iowa Housing Finance Authority, Des Moines, for amicus curiae Iowa Housing Finance Authority.

REYNOLDSON, Chief Justice.

Plaintiffs, James F. and Georgeann J. Martin, purchased a residential property from a borrower-mortgagor of defendant Peoples Mutual Savings and Loan Association (Association). They then brought this declaratory judgment action to nullify the due-on-sale acceleration clause in the Association's mortgage. Trial court granted the requested relief and the Association appealed. We reverse and remand.

The Waterloo, Iowa, home involved in this litigation was purchased new by Brian C. and Kathleen S. Jorgensen in April 1978 for $73,500. The purchase was financed in part by a $59,860 loan from the Association, secured by a first mortgage. Paragraph

seventeen of the mortgage stated in relevant part:

> 17. *Transfer of the Property: Assumption.* If all or any part of the Property . . . is sold or transferred by Borrower without Lender's prior written consent . . . Lender may, at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable. Lender shall have waived such option to accelerate if, prior to the sale or transfer, Lender and the person to whom the Property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Lender and that the interest payable on the sums secured by this Mortgage shall be at such rate as Lender shall request. If Lender has waived the option to accelerate provided in this paragraph 17, and if Borrower's successor in interest has executed a written assumption agreement accepted in writing by Lender, Lender shall release Borrower from all obligations under this Mortgage and the Note.

Paragraph seventeen also provided for at least a thirty-day notice of an intent to accelerate the balance due.[1]

Mrs. Jorgensen, who apparently assumed the leading role in the family's financial dealings, testified that at the time the mortgage was signed she "did have some information besides what was in the mortgage as to whether the loan was assignable or not." She thought that Mr. Burns, the Association's loan officer, had gone through with her the written "Notice to Customers Required by Federal Law—Federal Reserve Regulation Z." That notice, placed in evidence, states in typing twice as large as its printed provisions that "[t]his loan is not assumable without Lender consent." Mrs. Jorgensen had signed the notice on the day the mortgage was signed, as an acknowledgment that she received "the disclosures made in this notice."

In the spring of 1979 the Jorgensens decided to go back to college and listed their home for sale. At approximately the same time, the Martins had consulted broker Michael Ott about purchasing a house. After analyzing Martins' income with them, Ott had advised them to look at houses in the $60,000 to low $70,000 price range. Nonetheless, the Martins were captivated by the Jorgensen house and on September 9, 1979, after negotiations, contracted to buy it for $82,500. The contract contained this provision:

> If this sale contemplates a mortgage assumption, buyers may declare this contract null and void and demand a refund of their down payment if such mortgagee accelerates said mortgage or raises the interest rate thereon to a rate exceeding 9% per annum.

The Martins then made application to the Association to assume Jorgensens' loan. The application was processed and Martins were found to meet credit and income requirements. They were approved to assume the loan at a contract interest rate of eleven percent. That was then the maximum legal rate. It was being charged at the time by the Association and comparable

---

1. The language of paragraph seventeen of the Jorgensen mortgage is a standard provision and surfaces in a number of the decisions cited in this opinion. *See, e.g.,* Mills v. Nashua Fed. Sav. & Loan Ass'n, 121 N.H. 722, 723, 433 A.2d 1312, 1313 (1981); First Fed. Sav. & Loan Ass'n v. Kelly, 312 N.W.2d 476, 477 (S.D.1981). It is virtually identical to the one by which the Federal Home Loan Bank Board (FHLBB), whose regulations affect all federally chartered savings and loan associations, permits and regulates the use of due-on-sale clauses. *See* 12 C.F.R. § 545.8–3(f)–(g) (1981). The Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association, both quasi-federal entities, require and use a due-on-sale clause like that of the FHLBB. *See* Williams v. First Fed. Sav. & Loan Ass'n, 651 F.2d 910, 912 n.2 (4th Cir. 1981); *Mills,* 121 N.H. at 725, 433 A.2d at 1314 (citing G. Osborne, G. Nelson & D. Whitman, *Real Estate Fin. Law* § 5.25, at 310 (1979)). Regulations of the FHLBB permit federally chartered associations to invoke these provisions to call the loan when the mortgaged property is sold. 12 C.F.R. § 545.8–3(f)–(g) (1981); *see Williams,* 651 F.2d at 921–22; Twin City Fed. Sav. & Loan Ass'n v. Gelhar, 525 F.Supp. 802, 803 (D.Minn.1981); Price v. Florida Fed. Sav. & Loan Ass'n, 524 F.Supp. 175, 177 (M.D.Fla.1981). The Supreme Court should decide this term whether these regulations preempt state law restrictions on due-on-sale clauses. *See* 50 U.S.L.W. 1155 (April 13, 1982).

lending agencies. The Martins declined to enter into an assumption agreement on those terms. They subsequently signed a supplemental agreement with Jorgensens to withdraw the mortgage-assuming condition in the sales contract. Martins agreed in writing that "If Peoples Mutual Savings & Loan Association prevails in asserting the call clause, Buyer herein will secure new financing."

October 25, 1979, in Ott's office, Jorgensens conveyed the property to Martins, subject to the $59,263.69 mortgage, which Martins agreed to pay. November 6, 1979, the Association sent Jorgensens an acceleration letter, requesting payment of the mortgage balance by December 14, 1979. November 30, 1979, Martins brought this declaratory judgment action, seeking to prevent the Association from using the due-on-sale provision to accelerate payment of the loan. Martins' litigation is supported by the Iowa Association of Realtors.

The rationale for trial court's ruling, as expanded following a motion to enlarge, appears to be based on an asserted violation of subsection 535.2(4), The Code 1979. In further support of trial court's judgment, the Martins contend here, as they did in district court, that the due-on-sale clause is unenforceable because it is a restraint on alienation.

I. *Does subsection 535.2(4), The Code 1979, prohibit the Association from accelerating the loan balance under its mortgage due-on-sale clause?*

Subsection 535.2(4), The Code 1979, in its entirety reads:

> Notwithstanding the provisions of subsection 3, with respect to any agreement which was executed prior to August 3, 1978, and which contained a provision for the adjustment of the rate of interest specified in that agreement, the maximum lawful rate of interest which may be imposed *under that agreement* shall be nine cents on the hundred by the year, and any excess charge shall be a violation of section 535.4.[2]

(Emphasis added.) Trial court's ruling was based on its finding "that Paragraph 17 of the mortgage agreement has a provision for the adjustment of interest inasmuch as Paragraph 17 states, in part, '. . . that the interest payable on the sums secured by this mortgage shall be at such rate as Lender shall request.'"

The language of subsection 535.2(4) restricts its application. It only applies to "agreements" (1) that were executed prior to August 3, 1978, and (2) that contain a provision for the adjustment of the rate of interest specified *in that agreement.* It is plain that the subsection's restriction limiting interest rate changes to nine percent only applies if the interest rate is to be imposed "under that agreement." Of course it follows that if the interest rate is to be imposed under another agreement, subsection 535.2(4) does not apply.

■ Paragraph seventeen of the mortgage is part of an agreement between the Jorgensens and the Association. Because the promissory note refers to the mortgage provision controlling acceleration, the total contract is combined in the note and mortgage. However, because only the note refers to the interest Jorgensens were to pay to the Association, its provisions are the terms of the agreement for subsection 535.-2(4) purposes. *See Frenzel v. Frenzel*, 260 Iowa 1076, 1080–81, 152 N.W.2d 157, 160 (1967) (note is the primary contract, the mortgage an incident thereto). Mortgage paragraph seventeen in no way controls the interest agreement between the Jorgensens and the Association. Neither party could invoke the paragraph to alter *their* agreement about interest rates. The note sets the interest rate at nine percent without any provision for changing the rate. Subsection 535.2(4) does not apply to the agreement between Jorgensens and the Association because it did not contain "a provision for the adjustment of the rate of interest *specified in that agreement.*"

---

**2.** Two sections 535.2 were printed in the 1979 Code. However, the alternative section was not effective in the fall of 1979 because the temporary § 535.2, which was italicized in the Code, was readopted. *See* 1979 Iowa Acts ch. 130, §§ 17–19.

It is true that mortgage paragraph seventeen contemplates an interest rate change and refers to an agreement. But the agreement that paragraph seventeen refers to is between "the Lender [Association] and the person to whom the Property is to be sold or transferred," not the interest rate agreement between Jorgensens and the Association. The agreement that would change the interest rate in this case would be in neither the note nor the mortgage, but in an assumption agreement between the Association and a third party. This second agreement cannot invoke the subsection 535.2(4) interest ceiling because an interest rate in a subsequent agreement is not imposed "under that agreement" that "contained a provision for the adjustment of the rate of interest." It is equally clear this definitional requirement must be met for application of subsection 535.2(4) according to its terms.

This conclusion necessarily limits application of subsection 535.2(4), The Code 1979, to variable interest rate mortgages, as we believe the legislature intended. Such a construction finds support in other provisions of section 535.2. Subsection 535.-2(3)(d), immediately preceding the subsection under scrutiny, specifically describes a variable rate agreement.

Martins argue mortgage paragraph seventeen is a provision for the "adjustment" of the rate of interest, that being the term employed in subsection 535.2(4). Any such "adjustment," however, would not trigger the subsection 535.2(4) interest ceiling due to the "under that agreement" language of that statute. Moreover, paragraph seventeen obviously is a mechanism for initiating negotiations with different parties, not adjusting terms in the original agreement. "Adjustment" as used in subsection 535.2(4) invokes the concept of modifying an existing agreement "executed prior to August 3, 1978," not creating a new contract with a different party. The interest rate increase the Association requested would have been imposed after August 3, 1978, on strangers to the original contract, under a new written agreement between the Association and the Martins. Upon execution of the assumption agreement, Jorgensens, the mortgagors, would have been released.

Martins further assert "[s]ection 535.2(4), The Code 1979, in no way limits its protection to the original parties to the agreement." Again, they ignore the fact that the interest limitation of that statute applies only to an agreement executed before August 3, 1978, containing a provision for the adjustment of the interest rate, where the change of interest would be imposed "under that agreement." Martins do not allege they are a third-party beneficiary of "that agreement" between Jorgensens and the Association, nor could they logically do so as paragraph seventeen contemplates a new assumption agreement for a different interest rate between different parties.

Similarly without controlling force is Martins' claim that the mortgage assumption does not create a new security interest and, therefore, the agreement is unchanged. It is true, but irrelevant, that the mortgage remains the same. The Martins' argument is premised on their contention that the mortgage is the subsection 535.2(4) agreement providing for the interest rate, a contention we have already considered and rejected.

■ Martins also argue subsection 535.-2(4), The Code 1979, should be construed to prohibit due-on-sale accelerations because subsequent legislation discloses a legislative intent to limit the function of due-on-sale provisions. We reject this rationale. Present subsection 535.2(4) was enacted in 1978. 1978 Iowa Acts ch. 1190, § 11. It was not until the following year that any statutory limitation was imposed on due-on-sale accelerations. 1979 Iowa Acts ch. 132, § 16 (effective July 1, 1979); see id. ch. 130, § 22.2(c).

Martins' brief notes that this provision, now subsection 535.8(2)(c), The Code 1981, "makes it unlawful for Iowa lenders to invoke due-on-sale clauses on mortgages executed after July 1, 1979, unless the party that is assuming the loan and mortgage will jeopardize repayment of the loan or impair the security." They argue construing sub-

section 535.2(4) as they suggest would thus effect a uniform and consistent policy. However, the subsequent development of the 1979 acts discloses that in 1980 the Senate adopted an amendment to subsection 535.8(2)(c) that provided, *inter alia*, "The provisions of this paragraph are retroactive." 1980 H.J. 1355–56. This provision was not passed into law. *See* 1980 Iowa Acts ch. 1156, § 8. Thus we have an indication of legislative intent that a limitation on due-on-sale acceleration clauses not be applied retrospectively. There is less reason to interpret subsection 535.2(4), which does not mention such clauses, to nullify retrospectively the acceleration clause under examination. *See IPALCO Employees Credit Union v. Culver*, 309 N.W.2d 484, 486–87 (Iowa 1981); § 4.5, The Code.

We have examined the Martins' other arguments that subsection 535.2(4) prohibits the Association from accelerating the loan balance pursuant to the due-on-sale terms of its mortgage. We find these arguments to be without merit. Accordingly, we turn to the issue whether our common law prohibits the Association from invoking the terms of the mortgage to recover its loaned funds.

II. *Does Iowa's common law prohibit the Association from invoking the due-on-sale clause of its mortgage?*

In district court Martins pleaded and argued the acceleration clause in mortgage paragraph seventeen was unenforceable because it was a restraint on the alienation of the property they purchased. They make the same argument here, relying on *Wellenkamp v. Bank of America*, 21 Cal.3d 943, 582 P.2d 970, 148 Cal.Rptr. 379 (1978), and its progeny, cases that increasingly represent a minority view.

To place this issue in proper perspective, we first note acceleration clauses are not viewed with disfavor in our law. In *Federal Land Bank v. Wilmarth*, 218 Iowa 339, 343–44, 252 N.W. 507, 509 (1934), we quoted with approval the following from *Swearingen v. Lahner*, 93 Iowa 147, 151, 61 N.W. 431, 433 (1894):

Stipulations [acceleration clauses] such as are found in these notes and in the mortgage under consideration are not regarded in the nature of a penalty or forfeiture, and, for that reason, viewed with disfavor by the courts, but as agreements for bringing the notes to an earlier maturity than expressed upon their face, and are to be construed and the intention of the parties ascertained by the same rules as other contracts.

*See Dunn v. General Equities of Iowa, Ltd.*, 319 N.W.2d 515, 516 (Iowa 1982); *Frenzel*, 260 Iowa at 1080, 152 N.W.2d at 160 ("Such clauses are always held to be for the creditor's benefit."); 1A A. Corbin, *Corbin on Contracts*, § 265 at 537–38 (1963). Acceleration clauses are invoked under our commercial law as a matter of course. *See Farmers Trust & Savings Bank v. Manning*, 311 N.W.2d 285 (Iowa 1981); *Farmers Cooperative Elevator v. State Bank*, 236 N.W.2d 674, 677–78 (Iowa 1975).

This jurisdiction's rule on acceleration provisions in real estate agreements was laid out in *Risser v. Union Securities Co.*, 200 Iowa 987, 205 N.W. 648 (1925). There a real estate contract carried a due-on-assignment acceleration clause. When the vendee assigned the contract without the vendor's consent, the latter elected to declare all installments due and brought action to foreclose the contract. The vendee contended the acceleration clause was void. The *Risser* court's analysis is pertinent here:

But he [the vendee] knowingly agreed in his contract that, if he did assign it (as he had a right to do), then all installments should at once become due. The one question presented to us is whether the vendee was thereby under disability to contract for the immediate payment of the purchase price, upon an assignment of the contract. Clearly, he could have contracted in the first instance for the full payment of the purchase price at the time of the execution of the contract. He was under no greater disability to contract first for time and for a later acceleration of payments in the specified contingency. We hold, therefore, that there was no disability; nor is there any question of public policy presented.

In the confessed absence of artifice or deception in including a proviso for acceleration of payment in a given contingency, we hold the same to be as valid as any other part of the contract.

*Risser*, 200 Iowa at 990, 205 N.W. at 649. *See also Snyder v. Bernstein Brothers*, 201 Iowa 931, 934–35, 208 N.W. 503, 505 (1926) (upholding validity of a termination-on-assignment clause in a lease).

■ We have noted the rule against restraints on alienation bars direct restraints on the alienability of present or future vested interests. *Trecker v. Langel*, 298 N.W.2d 289, 291 (Iowa 1980). More generally, "the rule on alienation of property is concerned with the limitations that may be imposed upon the enjoyment of property." *Sisters of Mercy v. Lightner*, 223 Iowa 1049, 1059, 274 N.W. 86, 92 (1937).

At the outset we further observe that the Martins seek to invalidate a contract to which they were not a party on public policy grounds. This court's views of their burden were expressed well in *Tschirgi v. Merchants National Bank*, 253 Iowa 682, 690–91, 113 N.W.2d 226, 231 (1962):

It is not the court's function to curtail the liberty to contract by enabling parties to escape their valid contractual obligation on the ground of public policy unless the preservation of the general public welfare imperatively so demands.

. . . In Cole v. Brown-Hurley Hardware Co., 139 Iowa 487, 491, 117 N.W. 746, 748 . . . we quoted from Richmond v. Dubuque & Sioux City R. Co., 26 Iowa 191, 202, as follows: "* * * the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

The case before us is unlike *Wellenkamp* and several cases from other jurisdictions that arrive at the appellate level without an evidentiary record via a dismissal on general demurrer, or other summary trial court procedure. Here the Association presented substantial expert testimony detailing the economic and social consequences that would flow from nullification of acceleration clauses like that before us.

Our review on this issue is de novo. *Freese Leasing v. Union Trust & Savings Bank*, 253 N.W.2d 921, 925 (Iowa 1977). We make the following factual findings, most of which track with trial court's findings and are undisputed in the record.

The Association is a mutual savings and loan association chartered under the Iowa law, chapter 534, The Code, with the basic purpose of promoting thrift and home ownership. Such associations now provide financing for more than one-half of the single-family housing in Iowa. The Association has no stockholders and declares no dividends. Its owners and members are its savings depositors and those who owe real estate mortgage loans. Profits go into its reserves and are loaned out in the community to finance housing. The Association was organized in 1879. By trial time it had accumulated in its 101 year existence a total profit of $4,500,000, most of which was invested in first mortgage real estate loans. Such organizations incur severe federal tax penalties if they do not make at least eighty-two percent of their loans for home mortgages.

Although at the times relevant here the Association's housing loans were made for a thirty-year period, its experience of turnover, that is, the repayment of loans, was seven years or less. Ordinarily such a repayment pattern, common in the industry,[3] provides the savings and loan associations an opportunity to adjust interest rates. Because this reduces the risk to the lender, it makes these mortgages more attractive and thus permits the interest rate to be lower.

The development that led to this litigation was the rapid increase in interest rates in the 1970s. Savings accounts became

---

**3.** *See Dunham v. Ware Sav. Bank*, 1981 Mass.Adv.Sh. 1607, 1610, 423 N.E.2d 998, 1001 (1981).

short-term with increasingly higher rates. In the last three months of 1979 many people found it profitable to pay penalties to withdraw their money from long-term certificates of deposit and put their money into money market certificates that paid higher interest. These penalties made 1979 profits appear better than would otherwise have been the case. By March 1980, however, about seventy percent of the Association's deposits were on terms of less than one year. The Association was "borrowing short and lending long." By March 30, 1980, the Association was paying an average 9.71% interest rate and receiving an average interest rate on loans of 9.67%. The savings and loan industry was then unusually depressed.

In order to relieve the above income pressure, the Association in 1973 began to adjust loan interest to current rates when the mortgaged real estate was sold, through invoking the due-on-sale clause. Until the Martins incident they were able to accomplish this through negotiation without the necessity of accelerating the mortgage balance or foreclosing under the due-on-sale provision.

In the fall of 1979 when the Jorgensen-Martin real estate transaction was taking place, the general market rate of interest was 11.5 to 12%, but Iowa had imposed a maximum legal rate on real estate loans of 11%. At the time the Association offered Martins an assumption agreement at eleven percent, the general inflation rate was thirteen percent. The proffered agreement at this rate was characterized by economics professor Steven Gold as a "good buy" for the Martins.

The evidence disclosed Jorgensens' due-on-sale mortgage provision was no impediment to the sale of their home. Nor was a similar provision in the mortgage on Martins' prior home a restraint on the sale of that dwelling. Mrs. Martin testified that when they deleted the loan assumption condition from the Jorgensen contract they anticipated that at the worst they would "have to go out and get 11 percent money to pay off the Peoples Mutual mortgage."

A realtor who testified for the Martins, representing the Iowa Association of Realtors, stated he knew of no person who had been "foreclosed upon" as a result of a due-on-sale provision. He testified that given two comparable houses, one with an unassumable mortgage and one with no mortgage, each would sell for the same price. Another realtor-witness conceded there was "no more deterrent with selling a house that has a nonassumable mortgage than the house that is owned free and clear." The evidence reflected that mortgagors with fixed-rate, fixed-payment loans have benefited during this inflationary period because inflation has allowed them to pay off their loans with less valuable dollars, they have had the benefit of a low interest rate during times of rising rates, and inflation has given them more than a fair return on their original investment because they have used money borrowed from a lending institution for leverage to stay ahead of the inflation rate.

There was abundant evidence disclosing the economic and social consequences of nullifying the due-on-sale provisions. An exhibit in evidence discloses that on March 30, 1979, the Association carried 48,610 mortgages with interest rates from 5.01 to 9%. If the due-on-sale clauses are unenforceable, these mortgages carrying an under-market interest rate would not be prepaid and, of course, there would be no device for the Association to recover its money when the house was sold. This would continue and exacerbate the "negative spread" between the interest the Association was required to pay and the interest it received on its pre-July 1, 1979, loans. This could be balanced only by charging new borrowers a higher rate of interest than they would otherwise be required to pay, as trial court found. For every home buyer permitted to assume a nine percent loan, two to five new borrowers would be required to pay one to two percent higher interest rates than otherwise would be charged, depending upon the experienced duration of the assumed loans.

A sizable source of funds that enables the Association to make more home loans in the community is the sale of existing loans in the "secondary market." This market includes other state and federal savings and loan associations, banks, and insurance companies that have a surplus of funds to invest. Such sales comprised about one-third of the Association's business volume in 1979. Buyers in the secondary market consider mortgage loans with shorter maturities better values in their portfolios. The due-on-sale provision was a standard form requirement of Federal Home Loan Mortgage Corporation, a government corporation to which loans were sold. Other purchasers required the mortgages to contain due-on-sale provisions. The testimony of other knowledgeable witnesses reinforced Dr. Gold's opinion that mortgages tending to have a long life were less desirable to the secondary market buyer, and the latter would demand a higher interest rate.

Finally, the evidence disclosed federal savings and loan associations are authorized to use and enforce due-on-sale mortgage provisions. The necessity to charge higher interest rates, if such provisions were nullified for Iowa savings and loan associations, would place the state organizations at a competitive disadvantage with the federal associations.

Against the above evidentiary backdrop developed at trial, we turn to the Martins' arguments for invalidating paragraph seventeen of Jorgensens' mortgage. They first assert enforcement of this due-on-sale clause is a direct restraint on the sale of the real estate.

■ The Restatement of Property § 404 (1944) defines a restraint on alienation as follows:

(1) A restraint on alienation, as that phrase is used in this Restatement, is an attempt by an otherwise effective conveyance or contract to cause a later conveyance

(a) to be void; or

(b) to impose contractual liability on the one who makes the later conveyance when such liability results from an agreement not to convey; or

(c) to terminate or subject to termination all or a part of the property interest conveyed.

It is obvious that a due-on-sale mortgage provision does not cause any of the above results and therefore cannot be categorized as a direct restraint on alienation. *Holiday Acres No. 3 v. Midwest Federal Savings & Loan Association*, 308 N.W.2d 471, 483–84 (Minn.1981); *Occidental Savings & Loan Association v. Venco Partnership*, 206 Neb. 469, 472–73, 293 N.W.2d 843, 845–46 (1980); *Mills v. Nashua Federal Savings & Loan Association*, 121 N.H. 722, 724, 433 A.2d 1312, 1314 (1981).

It is apparent the alleged restraining language does not affect the title or conveyance of the title.

The questioned clause in no manner precludes the owner-mortgagor from conveying his property. The owner is free to convey without legal restraint and the conveyance does not cause a forfeiture of title, but only an acceleration of the debt.

*Occidental Savings*, 206 Neb. at 472, 293 N.W.2d at 845. In the case before us, title was conveyed without restraint.

Under Martins' theory the claimed restraint must result from the mortgage provisions. The language of paragraph seventeen went further than merely to warn the borrower that the Association's concern would be limited to its security. The borrower was informed the Association's waiver of the acceleration would require the Association (1) to be satisfied with the buyer's credit, and (2) "that the interest payable on the sums secured by this mortgage shall be at such rate as Lender shall request." No one should have been surprised that the Association would require an interest rate that would reflect current money market conditions.

Nonetheless, the Martins insist that the Association's use of the clause "for [the] purpose of increasing the interest rate is a great restraint on the alienation of property." Obviously, the issue whether a mortgage imposes a legal restraint on alienation

of real estate should not be made to turn on the subjective intent of the mortgagee. Adoption of the Martins' concept of a restraint on alienation would require courts to make that determination on an ad hoc basis in every challenged application of a due-on-sale clause, analyzing economic conditions and probing the motivations and situations of various people, including those unrelated to the mortgage document itself. "A legal concept should not be established on that basis." *Occidental Savings*, 206 Neb. at 478, 293 N.W.2d at 848.

As the expert evidence in this case indicates, the actual effect of striking the due-on-sale provision would be to permit borrowers not only to sell their home, but to obtain a premium for something else—a long-term loan with below-market interest through nullification of a plain provision in a solemn contract. On the other hand, if the provision is permitted to stand, the borrower would never obtain less for the home than what it would sell for if there were no mortgage on it at all. There is no logic in the contention that because the due-on-sale clause subjects the sale of the home to current market conditions, it is the due-on-sale clause rather than the economy that has an inhibitory effect on the transfer. A due-on-sale mortgage clause is no more an impediment to alienation of real estate than zoning restrictions or building restrictions that frequently affect the sale price of property. If such mortgage provisions are to be so classified, then the recently authorized "variable rate" mortgages [4] and "renegotiable rate" mortgages [5] will fall under the ban. *See Occidental Savings*, 206 Neb. at 477–78, 293 N.W.2d at 847–48.

Alternatively, the Martins argue the court should test the validity of the clause under the "reasonable under the circumstances" test. The contention implies, of course, that the court is charged with the duty of reconstructing contracts, fully understood and duly executed, so that the agreement will be "reasonable" in light of subsequent events. In absence of fraud or overreaching, however, courts have neither the constitutional power nor the resources to fulfill such a roving mandate. *See Culligan Soft Water Service v. Berglund*, 259 Iowa 660, 666–67, 145 N.W.2d 604, 608 (1966). Nor, in any event, do we find unreasonable the Association's use of the clause with the intent it plainly expresses. Jorgensens' home was no more difficult to sell than if it had been free from encumbrance. All they could have lost was an advantage they never had in the first instance because they expressly contracted it away.

In *Trecker v. Langel*, 298 N.W.2d 289, 292 (Iowa 1980), dealing with a preemption contract, we wrote:

> The effect of a pre-emption as a practical impediment to alienation hinges upon this matter of price. If the pre-emptive right requires that the property be offered at much less than its value at the time of proposed sale, there is an obvious check upon alienation, since the owner will retain the property rather than sell it at a great sacrifice.

Invoking a due-on-sale clause does not require an owner to sell real estate at below-market price. He or she will obtain its full value on the market. What the borrower-seller is denied is an inflated price generated by an encumbrance carrying a below-market interest rate. We reject both the test the Martins urge the court to apply, and the concept that application of the due-on-sale clause produces an unreasonable result.

■■ The Martins further assert the Association's mortgage is an adhesion contract, which renders enforcement of the due-on-sale clause unconscionable, citing *C & J Fertilizer, Inc. v. Allied Mutual Insurance Co.*, 227 N.W.2d 169 (Iowa 1975). We reject this contention for several reasons.

First, there is abundant evidence in this record that Jorgensens were fully aware of

---

4.  § 535B.6, The Code 1981 (this provision was created by 1979 Iowa Acts ch. 132, § 7).

5.  § 534.21(2), The Code 1981 (the renegotiable rate mortgage provision was created by 1980 Iowa Acts ch. 1156, § 31).

the paragraph seventeen provisions when they signed the mortgage. They are not parties to this suit, and there is no allegation they were harmed by the due-on-sale clause. Second, the Martins have not demonstrated their standing to make this contention when they were not parties to the contract and make no claim as third-party beneficiaries. Third, this issue is not properly before the court. It was raised for the first time by the Attorney General's district court amicus brief. Reviewable issues must be presented in the parties' briefs, not an amicus brief.[6] *Board of Directors v. Mroz*, 295 N.W.2d 447, 450 (Iowa 1980); *Sauerman v. Stan Moore Motors, Inc.*, 203 N.W.2d 191, 194 (Iowa 1972).

We find no merit in the Martins' arguments on this issue.

■ Finally, the Martins assert that as a matter of public policy, application of the due-on-sale clause should be confined to those cases in which the lender's security will be impaired by the mortgage assumption. At the beginning of this division we set out our case law that limits the reach of "public policy" to curtail the liberty to contract, "unless the preservation of the general public welfare imperatively so demands." *Tschirgi*, 253 Iowa at 690, 113 N.W.2d at 231. We find no such imperative demand here.

Setting aside constitutional considerations, it is significant that the body basically charged with implementing public policy, the legislature, obviously considered and rejected such limitations on due-on-sale clauses in mortgages executed before July 1, 1979. In division I we referred to the legislative history of what is now subsection 535.8(2)(c), The Code 1981, and the rejection of an amendment to make that statute operate retrospectively. The subsection 535.-8(2)(c) limitation was not enacted until after the legislature lifted the nine percent interest ceiling. *See* 1979 Iowa Acts ch. 130.

The record before us shows that prohibiting the use of due-on-sale clauses to effect an adjustment of interest to current conditions would restrict the ability of Iowa savings and loan associations to make new home loans at competitive rates. It would place Iowa chartered associations at a disadvantage with federal associations. It would require Iowa associations to charge two to five new borrowers a higher rate of interest for each real estate sale in which a nine percent mortgage was assumed, depending on the length of time before the assumed loan is repaid.

In the longer view, the supply of money in Iowa to finance home buying is subject to the economic laws of supply and demand. The expert testimony of Dr. Gold in this case, coupled with a study of the recent legislation, discloses the legislature accepts that fact. The majority of other jurisdictions permit enforcement of acceleration provisions. They include *Tierce v. APS Co.*, 382 So.2d 485 (Ala.1979); *Malouff v. Midland Federal Savings & Loan Association*, 181 Colo. 294, 509 P.2d 1240 (1973); *Baker v. Loves Park Savings & Loan Association*, 61 Ill.2d 119, 333 N.E.2d 1 (1975); *Provident Federal Savings & Loan Association v. Realty Centre, Ltd.*, 101 Ill.App.3d 277, 428 N.E.2d 170, 56 Ill.Dec. 851 (1981); *Slevin Container Corp. v. Provident Federal Savings & Loan Association*, 98 Ill.App.3d 646, 424 N.E.2d 939, 54 Ill.Dec. 189 (1981); *Taliancich v. Union Savings & Loan Associa-*

---

**6.** The Attorney General's office has issued two conflicting opinions on the question in this case. The first, No. 79–8–23, was issued August 20, 1979. The last opinion, No. 80–3–24, issued March 28, 1980, adopted the view of a minority of jurisdictions and followed the filing of this lawsuit. Timing of the second opinion seems to undercut the policy expressed in Op. Atty.Gen. No. 68–1–33, which stated:

> Since the questions you pose are now before the Courts of this state, any attempt to render an opinion would tend to invade the ex-

clusive province of those Courts and, we must, therefore, respectfully decline at this time to furnish such an opinion.

The Attorney General's last opinion does not agree with the written position of the supervisor who, under chapter 534, The Code, has supervisory control of state chartered savings and loan associations. Nor, under the record in this case, does it reflect the best interests of the majority of home buyers who must finance their purchase.

*tion*, 142 So.2d 626 (La.Ct.App.1962) (*cf. Rayford v. Louisiana Savings Association*, 380 So.2d 1232 (La.Ct.App.1980) (would not enforce acceleration clause when transfer was strictly between original mortgagors)); *Chapman v. Ford*, 246 Md. 42, 227 A.2d 26 (1967); *Dunham v. Ware Savings Bank*, 1981 Mass.Adv.Sh. 1607, 423 N.E.2d 998 (1981); *Holiday Acres No. 3 v. Midwest Federal Savings & Loan Association*, 308 N.W.2d 471 (Minn.1981); *Occidental Savings & Loan Association v. Venco Partnership*, 206 Neb. 469, 293 N.W.2d 843 (1980); *First Commercial Title, Inc. v. Holmes*, 92 Nev. 363, 550 P.2d 1271 (1976); *Mills v. Nashua Federal Savings & Loan Association*, 121 N.H. 722, 433 A.2d 1312 (1981); *Century Federal Savings & Loan Association v. Van Glahn*, 144 N.J.Super. 48, 364 A.2d 558 (N.J.Super.Ct.Ch.Div.1976); *Ceravolo v. Buckner*, 111 Misc.2d 676, 444 N.Y.S.2d 861 (S.Ct.1981); *First Federal Savings & Loan Association v. Jenkins*, 109 Misc.2d 715, 441 N.Y.S.2d 373 (S.Ct.1981); *Stith v. Hudson City Savings Institution*, 63 Misc.2d 863, 313 N.Y.S.2d 804 (S.Ct.1970) (*cf. Silver v. Rochester Savings Bank*, 73 A.D.2d 81, 424 N.Y.S.2d 945 (App.Div. 1980)); *Crockett v. First Federal Savings & Loan Association*, 289 N.C. 620, 224 S.E.2d 580 (1976); *Northwestern Federal Savings & Loan Association v. Ternes*, 315 N.W.2d 296 (N.D.1982); *People's Savings Association v. Standard Industries, Inc.*, 22 Ohio App.2d 35, 257 N.E.2d 406 (Ct.App.1970) (*cf. Great Northern Savings Co. v. Ingarra*, 66 Ohio St.2d 503, 423 N.E.2d 128 (1981) (issue not reached)); *First Federal Savings & Loan Association v. Kelly*, 312 N.W.2d 476 (S.D.1981) (statute controlled); *Gunther v. White*, 489 S.W.2d 529 (Tenn.1973); *Crestview, Ltd. v. Foremost Insurance Co.*, 621 S.W.2d 816 (Tex.Civ.App.1981); *Sonny Arnold, Inc. v. Sentry Savings Association*, 615 S.W.2d 333 (Tex.Civ.App.1981); *Walker Bank & Trust Co. v. Neilson*, 26 Utah 2d 383, 490 P.2d 328 (1971); *Lipps v. First American Service Corp.*, —— Va. ——, 286 S.E.2d 215 (1982); *United Virginia Bank/ National v. Best*, —— Va. ——, 286 S.E.2d 221 (1982); *Bellingham First Federal Savings & Loan Association v. Garrison*, 87 Wash.2d 437, 553 P.2d 1090 (1976); *Miller v. Pacific First Federal Savings & Loan Association*, 86 Wash.2d 401, 545 P.2d 546 (1976); *Mutual Federal Savings & Loan Association v. Wisconsin Wire Works*, 71 Wis.2d 531, 239 N.W.2d 20 (1976); *Weickhardt v. Wauwatosa Savings & Loan Association*, 103 Wis.2d 608, 309 N.W.2d 865 (Wis.Ct.App.1981).

Jurisdictions prohibiting enforcement of due-on-sale clauses to raise interest rates are *Patton v. First Federal Savings & Loan Association*, 118 Ariz. 473, 578 P.2d 152 (1978); *Tucker v. Pulaski Federal Savings & Loan Association*, 252 Ark. 849, 481 S.W.2d 725 (1972); *Dawn Investment Co. v. Superior Court*, 30 Cal.3d 695, 639 P.2d 974, 180 Cal.Rptr. 332 (1982); *Wellenkamp v. Bank of America*, 21 Cal.3d 943, 582 P.2d 970, 148 Cal.Rptr. 379 (1978); *First Federal Savings & Loan Association v. Lockwood*, 385 So.2d 156 (Fla.Ct.App.1980); *Nichols v. Ann Arbor Federal Savings & Loan Association*, 73 Mich.App. 163, 250 N.W.2d 804 (1977); *Sanders v. Hicks*, 317 So.2d 61 (Miss.1975); *State ex rel. Bingaman v. Valley Savings & Loan Association*, 97 N.M. 8, 636 P.2d 279 (1981).

We hold that due-on-sale clauses are valid and enforceable, subject to the statutory limitations in subsection 535.8(2)(c), The Code, referred to above. Of course such clauses also are subject to such equitable defenses as have been available heretofore with respect to acceleration clauses generally. *See Bettis v. Bettis*, 228 N.W.2d 193, 195 (Iowa 1975); *Merriam v. Leeper*, 192 Iowa 587, 596–97, 185 N.W. 134, 138 (1921). We reserve the issue whether certain other title events should be construed as sales or transfers under due-on-sale mortgage provisions, such as inheritances, transfers relating to spouses or on marriage dissolutions, and transfers to an inter vivos trust of which the mortgagor is a beneficiary. *See Mills*, 121 N.H. at 728, 433 A.2d at 1316; Federal Home Loan Bank Board Advisory Opinion No. 75–647 at 35–36 (July 30, 1975).

We reverse and remand for judgment in conformance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

All Justices concur except LARSON, J., who takes no part.