674 P.2d 419

Glenn B. LAKE and Susan K. Lake, husband and wife; and James M. Norfleet and Martha K. Norfleet, husband and wife, Plaintiff-Counterdefendants-Appellants,

v.

EQUITABLE SAVINGS AND LOAN ASSOCIATION, an Oregon corporation, Defendant-Counterclaimant-Respondent.

No. 14119.

Supreme Court of Idaho.

Dec. 2, 1983.

Fredric V. Shoemaker, of Clemons, Cosho & Humphrey, P.A., Boise, James B. Donart, Ketchum, for plaintiff-counterdefendants-appellants.

Gary D. Babbitt, Hawley Troxell Ennis & Hawley, Boise, for defendant-counterclaim-ant-respondent.

DONALDSON, Chief Justice.

In 1979, Glenn B. and Susan K. Lake purchased a home from an owner who had borrowed money from Equitable Savings. As security for the loan, the previous owners, Martha K. and James M. Norfleet, had given Equitable Savings a Deed of Trust containing a due-on-sale clause, a contractual provision that permits the lender to declare the entire balance of a loan immediately due and payable if the property securing the loan is sold or otherwise transferred. The contract in question contained a clause that stated that Equitable would consent to a transfer if the purchasing party agreed to increase the interest rate two percentage points.[1] The Lakes wanted to assume this loan but, when notified of the transfer, Equitable Savings gave notice of its intent to enforce the due-on-sale clause. Equitable Savings expressed a willingness to consent to the transfer, however, if the Lakes agreed to increase the interest rate on the loan secured by the property from 9½ percent to 11½ percent as set forth in the agreement.

The Lakes agreed under protest to pay the increase in interest rate and then

---

1. The clause stated:

"11. **Transfer of Property; Assumption; Conditions.**

"a. This loan is personal to Grantor and not assignable. In making it, Beneficiary has relied on Grantor's credit, Grantor's interest in the Trust Property, and financial market conditions at the time this loan is made. If Grantor transfers or contracts to transfer title to or possession of all or part of the Trust Property, by deed, contract of sale, lease or similar agreement, Beneficiary may declare the entire balance of this loan immediately due and payable.

"b. Beneficiary will waive its right under subparagraph 11.a. if the following conditions are met: (1) The credit of the third party is satisfactory to Beneficiary; and (2) the third party shall assume full personal liability for payment and performance of the note, Deed of Trust and other security instruments; and (3) a charge for administrative costs is paid to Beneficiary; and (4) if required by Beneficiary, either the interest rate on *the* secured loan is increased by *not more than two* (2%) percent, or Beneficiary is paid a lump sum compensation not to exceed two (2%) percent of the loan balance at the time of assumption.

"c. Any increase in the interest rate shall entitle Beneficiary to increase the monthly payments so the secured debt will be paid in full by the maturity date of this Deed of Trust.

"d. Assumption does *not release Grantor or* any successor in interest from personal liability for payment and performance of the terms and conditions of this loan."

brought a declaratory judgment action seeking a declaration that the due-on-sale clause was an unreasonable restraint on the alienation of the property and against public policy. The district court found otherwise and this appeal followed.

The issue raised on appeal is whether or not the trial court erred in concluding that the due-on-sale clause in the Deed of Trust is valid. On appeal, the Lakes argue that the due-on-sale clause in the deed is an unreasonable restraint on the alienation of property as well as being inequitable and unconscionable.

At oral argument both parties argued the applicability of a recent United States Supreme Court case and an Act recently passed by Congress. Since the transfer of the home in this case and the assumption of the loan by the Lakes, the United States Supreme Court in *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664, (1982), held that a regulation issued by the Federal Home Loan Bank Board, permitting federal savings and loan associations to use due-on-sale clauses in their mortgage contracts, preempted a contrary state law. However, because *Fidelity Federal* applies to federal savings and loan and Equitable Savings, at the time of this transfer was a state savings and loan, *Fidelity Federal* is not dispositive of the issue presented by the appellants.

■ After *Fidelity Federal* was decided, Congress passed the Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 (1982), that became effective October 15, 1982, and applied to state savings and loan corporations. Basically, the Act states that unless an exception applies a state lender may "enforce a contract containing a due-on-sale clause with respect to a real property loan." § 341(b)(1). At oral argument the parties both argued the applicability of this Act. However, § 341(c)(2)(B) specifically states that "[a] lender may not exercise its option pursuant to a due-on-sale clause in the case of a transfer of a real property loan which is subject to this subsection where the transfer occurred prior to the date of enact-

ment of this Act." Because the transfer in question occurred in November, 1979 and this Act became effective October 15, 1982, the Act does not apply to the issues presented on this appeal. Therefore, it is necessary for this Court to independently analyze the clause to determine its validity.

■ As stated, the appellants argue that the due-on-sale clause in the Deed of Trust is an unreasonable restraint on the alienation of property. Restatement of Property § 404 (1944), defines a restraint on alienation as follows:

"(1) A restraint on alienation, as that phrase is used in this Restatement, is an attempt by an otherwise effective conveyance or contract to cause a later conveyance

(a) to be void; or

(b) to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey; or

(c) to terminate or subject to termination all or a part of the property interest conveyed."

"It is obvious that a due-on-sale mortgage provision does not cause any of the above results and therefore cannot be categorized as a direct restraint on alienation." *Martin v. Peoples Mutual Savings & Loan Ass'n.*, 319 N.W.2d 220, 228 (Iowa 1982). The clause in question does not preclude the owner-mortgagor from conveying his property." The owner is free to convey without legal restraint and the conveyance does not cause a forfeiture of the title, but only an acceleration of the debt." *Occidental Savings & Loan Ass'n. v. Venco Partnership,* 206 Neb. 469, 293 N.W.2d 843, 845 (1980). *See also Williams v. First Federal Savings & Loan Ass'n.,* 651 F.2d 910 (4th Cir.1981); *Martin v. Peoples Mutual Savings & Loan Ass'n., supra; Mills v. Nashua Federal Savings & Loan Ass'n.,* 121 N.H. 722, 433 A.2d 1312 (1981); *see generally Enforcement of Due-on-Transfer Clauses,* 13 Real Prop., Prob. and Tr.J. 891 (1978). "To label the loss of a purported favorable economic position as a restraint on alienation is a miscon-

ception of that doctrine, which was not intended to provide profitability of alienation, but only the ability to alienate without penalty." *Enforcement of Due-on-Transfer Clauses, supra,* at 926.

Even if the due-on-sale clause is not a direct restraint on alienation, the Lakes also argue that it is an indirect restraint because it has the practical effect of suppressing the marketability of the property. Certainly, there is a possibility that an acceleration may impede the ability of an owner to sell his property in the manner he wishes but not every impediment to a sale is a restraint on alienation. In fact, zoning restrictions, building restrictions, or public improvements often impede the sale and substantially affect the ability of an owner to realize a maximum price but no one suggests that such restrictions are invalid simply because they affect the ease with which one may dispose of one's property. *Occidental Savings & Loan, Ass'n., supra.* As stated by the Court in *Occidental Savings & Loan, supra,* at 847–848:

> "If we conclude that a 'due on sale' clause is an unreasonable restraint on alienation and is, therefore, void, it may follow that mortgages of short duration (less than 3 or 4 years) with variable rates are likewise invalid as indirect restraints on alienation. Certainly, whatever arguments are made about the inability to convey property because of a 'due on sale' clause, may also be made with regard to a mortgage that must be renegotiated within 2 or 3 years after the sale at a price which the subsequent buyer may not be able to determine. It is true that the current owner of the property will be faced with the same problems whenever a short-term rollover mortgage or variable interest rate is placed upon the property and, therefore, the problems are not unique to a subsequent seller. Nevertheless, if the rationale for declaring a 'due on sale' clause invalid as a restraint on alienation is based upon some notion that buyers will be less willing to buy at a premium property that does not have a long-term fixed mortgage, then one must conclude that short-term varia-

ble rates and rollover mortgages will similarly impede the sale of property and constitute indirect restraints on the free conveyance of property, and should, therefore, be held invalid."

The Lakes argue that this Court should follow the California Supreme Court's decision in *Wellenkamp v. Bank of America,* 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970 (1978). In *Wellenkamp,* the court determined that a due-on-sale clause was unenforceable unless the lender could demonstrate that enforcement was reasonably necessary to protect the lender against the impairment of its security. The court in *Wellenkamp* seemingly based its opinion on considerations of social need and after balancing the rights and needs of the lender the court concluded that the needs of the seller outweighed those of the lender. At first blush the result reached in *Wellenkamp* seems to be in the best interests of everyone except the lender. However, the Federal Home Loan Bank Board has estimated that restrictions on the exercise of due-on-sale clauses in California accounted for forty percent of the total losses suffered in 1981 by state-chartered associations in the state—$200 million—resulting in less money available to potential borrowers. *Fidelity Federal Savings & Loan,* 102 S.Ct. at 3030 n. 21. Also, fewer loans would be available to borrowers because the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association, which purchased the bulk of mortgages sold in the secondary mortgage market, require due-on-sale clauses before these associations will purchase the loans. "The marketability of a mortgage in the secondary market is critical to a savings and loan, for it thereby can sell mortgages to obtain funds to make additional home loans." *Fidelity Federal Savings & Loan,* 102 S.Ct. at 3023 n. 10.

Therefore, we decline to follow the *Wellenkamp* decision and, instead, hold that even though the due-on-sale clause may affect the ease with which one may dispose of one's property as a matter of law, the due-on-sale clause is neither a direct nor indirect

restraint on alienation and, therefore, is not void as such.

The Lakes also argue that this due-on-sale clause is unconscionable and against public policy. This Court has stated that "[a]n agreement voluntarily made between competent persons is not likely to be set aside on public policy grounds." *Foremost Insurance Co. v. Putzier,* 100 Idaho 883, 887, 606 P.2d 987, 991 (1980). It has also been stated that public policy should not be allowed to curtail the liberty to contract unless the preservation of the general public welfare demands it. *Martin v. People Mutual Savings & Loan Ass'n.,* 319 N.W.2d 220 (Iowa 1982). The majority of jurisdictions permits enforcement of acceleration provisions. These jurisdictions include *Tierce v. APS Co.,* 382 So.2d 485 (Ala.1979); *Malouff v. Midland Federal Savings & Loan Ass'n.,* 181 Colo. 294, 509 P.2d 1240 (1973); *Baker v. Loves Park Savings & Loan Ass'n.,* 61 Ill.2d 119, 333 N.E.2d 1 (1975); *Taliancich v. Union Savings & Loan Ass'n.,* 142 So.2d 626 (La.Ct.App.1962) (*cf. Rayford v. Louisiana Savings Ass'n.,* 380 So.2d 1232 (La.Ct.App. 1980) (would not enforce acceleration clause when transfer was strictly between original mortgagors)); *Chapman v. Ford,* 246 Md. 42, 227 A.2d 26 (1967); *Dunham v. Ware Savings Bank,* 384 Mass. 63, 423 N.E.2d 998 (1981); *Holiday Acres No. 3 v. Midwest Federal Savings & Loan Ass'n.,* 308 N.W.2d 471 (Minn.1981); *Occidental Savings & Loan Ass'n. v. Venco Partnership,* 206 Neb. 469, 293 N.W.2d 843 (1980); *First Commercial Title, Inc. v. Holmes,* 92 Nev. 363, 550 P.2d 1271 (1976); *Mills v. Nashua Federal Savings & Loan Ass'n.,* 121 N.H. 722, 433 A.2d 1312 (1981); *Century Federal Savings & Loan Ass'n. v. Van Glahn,* 144 N.J.Super. 48, 364 A.2d 558 (1976); *Ceravolo v. Buckner,* 111 Misc.2d 676, 444 N.Y.S.2d 861 (1981); *First Federal Savings & Loan Ass'n. v. Jenkins,* 109 Misc.2d 715, 441 N.Y.S.2d 373 (1981); *Stith v. Hudson City Savings Institution,* 63 Misc.2d 863, 313 N.Y.S.2d 804 (1970) (*cf. Silver v. Rochester Savings Bank,* 73 A.D.2d 81, 424 N.Y.S.2d 945 (1980)); *Crockett v. First Federal Savings & Loan Ass'n.,* 289 N.C. 620, 224 S.E.2d 580 (1976) *Northwestern Federal Savings & Loan Ass'n. v. Ternes,* 315 N.W.2d 296 (N.D. 1982); *People's Savings Ass'n. v. Standard Industries, Inc.,* 22 Ohio App.2d 35, 257 N.E.2d 406 (1970) (*cf. Great Northern Savings Co. v. Ingarra,* 66 Ohio St.2d 503, 423 N.E.2d 128 (1981) (issue not reached)); *First Federal Savings & Loan Ass'n. v. Kelly,* 312 N.W.2d 476 (S.D.1981) (statute controlled); *Gunther v. White,* 489 S.W.2d 529 (Tenn.1973); *Crestview, Ltd. v. Foremost Insurance Co.,* 621 S.W.2d 816 (Tex.Civ.App. 1981); *Sonny Arnold, Inc. v. Sentry Savings Ass'n.,* 615 S.W.2d 333 (Tex.Civ.App.1981); *Walker Bank & Trust Co. v. Neilson,* 26 Utah 2d 383, 490 P.2d 328 (1971); *Lipps v. First American Service Corp.* 223 Va. 131, 286 S.E.2d 215 (1982); *Bellingham First Federal Savings & Loan Ass'n. v. Garrison,* 87 Wash.2d 437, 553 P.2d 1090 (1976); *Miller v. Pacific First Federal Savings & Loan Ass'n.,* 86 Wash.2d 401, 545 P.2d 546 (1976); *Mutual Federal Savings & Loan Ass'n. v. Wisconsin Wire Works,* 71 Wis.2d 531, 239 N.W.2d 20 (1976). In our view, the due-on-sale clause that permits the acceleration of the loan is not repugnant to public policy, but, to the contrary, under certain economic circumstances the clauses may favor the public interest and, therefore, be supportive of public policy. *Occidental Savings & Loan, supra.*

We hold that this particular due-on-sale clause is valid and enforceable. Therefore, we affirm the judgment of the trial court.

Costs to Respondent.

No attorney fees on appeal.

BAKES and HUNTLEY, JJ., concur.

SHEPARD, Justice, dissenting.

I am required to dissent because I believe the opinion of the majority fails to address the public policy question presented here and provides no rationale whatsoever for the decision, but rather contents itself with string citations and references to the specious "reasoning" of the United States Supreme Court in *Fidelity Federal Savings Loan Association v. De LaCuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). As has been said in another context, the

lack of reasoning and rationale makes today's opinion similar to a clock which strikes thirteen: not only is the instant pronouncement suspect, but its future pronouncements will be viewed with suspicion.

I deem it important to review what is actually at issue. The lender here purports to be able to control entirely the property which stands as security for the loan. The lender, in its prepared document, forbids not only the transfer of title to the property, but also any *possession* thereof, by anyone other than the borrower. Insofar as the document is concerned, it governs all situations, is sweeping and all-inclusive. Taken literally, it prohibits the property owner from renting his property, from entering into a contract of sale, from making a gift, and perhaps even from a transfer upon his death. In short, the terms of the document cannot reasonably be viewed as anything but a complete and absolute prohibition upon the alienation of the property. The lender in *Fidelity Federal Savings & Loan Association v. De LaCuesta, supra,* at least had the compassion to exclude from its control of that property "(a) the creation of a lien or encumbrance subordinate to this Deed of Trust, (b) the creation of a purchase money security interest for household appliances, (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (d) the grant of any leasehold interest of three years or less." *See* fn. 2, 102 S.Ct. at p. 3018, *Fidelity Federal, supra.*

I must agree with the majority's holding that *Fidelity Federal Savings & Loan Association v. De LaCuesta, supra,* is inapplicable to this case, since the lending institution here is not a federal savings and loan association. I also must agree with the majority's decision as to the non-applicability of the Garn-St. Germain Depository Institutions Act of 1982. My agreement, however, should not be construed to mean that I join in the majority's adoption of the "rationale" of *Fidelity Federal.* That opinion, as pointed out in the dissent of Mr. Justice Rehnquist, is enormously far-reaching and, boiled down to its essence, holds that the pronouncement of three bankers will preempt the laws of 50 states relating to real property conveyancing and the equity powers of state judges to control foreclosure proceedings in their own courts. In my view, such preemption doctrine is neither necessary nor desirable, is blatantly in conflict with basic tenets of federalism contained in the tenth amendment to the United States Constitution, and cannot but redound to the detriment of our federal system of government.

The opinion is purportedly grounded in congressional enactment of 1933 (HOLA). How incongruous! That legislation of the great depression, designed to provide relief from "home mortgage indebtedness" and the "burden of excessive interest" and to permit the people "to finance their homes and the homes of their neighbors," is now warped in its intent by the allowance and *requirement* of the exaction of excessive interest, making home financing difficult if not impossible, and stultifying the national real estate market. The Garn-St. Germain legislation is no less an unconstitutional invasion of our federal-state system of government and cannot be viewed as anything but blatant special interest legislation at the expense of the public.

At bottom, the instant case reduces to a question of whether Idaho courts, exercising their equitable jurisdiction in foreclosure actions, are to be bound by the provisions of a due-on-sale clause or whether they are, depending upon the circumstances, free and able to rule that such clauses are void or voidable as a matter of public policy as being unreasonable restraints on alienation or an unconscionable advantage to a lender resulting from a contract of adhesion. Put another way, the question becomes whether that contract clause, regardless of the benefit to the lender, results in widespread and adverse consequences to the general public.

It is clear that restraints on alienation are disfavored in the law. *Funk v. Funk,* 102 Idaho 521, 633 P.2d 586 (1982); *Bellingham v. First Federal S. & L. Ass'n v. Garrison,* 87 Wash.2d 437, 553 P.2d 1090 (1976).

"A 'restraint on alienation' is any provision in a trust or other instrument which, either by express terms or by implication, purports to prohibit or *penalize the use of the power of alienation*." (Emphasis added.) *Black's Law Dictionary*, p. 1183 (5th ed. 1979). Simes and Smith define a restraint on alienation as follows:

> "[T]he expression 'restraint on alienation' refers not merely to the restriction of the legal power of alienation, but also to the restriction of alienability as a practical matter. Any provision in a deed, will, contract, or other legal instrument which, if valid, would tend to impair the marketability of property, is a restraint on alienation." Simes and Smith, *The Law of Future Interests* § 1111 (2d ed. 1956).

*See also* Volkmer, "The Application of the Restraints on Alienation Doctrine to Real Property Security Interests, 58 Iowa L.Rev. 747 (1973).

It does not require the application of esoteric economic principles to understand that when, in today's marketplace, an owner of real property encumbered by a mortgage or trust deed is desirous of or required to sell that property, his power of alienation is severely penalized by a due-on-sale clause. If that owner-seller has a buyer who is equally creditworthy to himself and who is willing to pay the fair value of the property and undertake the obligation of the mortgage or trust deed, assuredly, either the buyer or the seller, or both, will be penalized by the due-on-sale provision. Either the seller will be required to reduce the price of the property below the fair value, or the buyer will be forced to pay a bonus windfall to the lending institution. Usually, the former alternative will be the case. As stated in *Wellenkamp v. Bank of America*, 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970, at 974–75 (1978),

> "The availability of new financing often depends upon general economic conditions. In times of inflation, when money is 'tight' and funds available for real estate loans are in short supply, new financing may be difficult, if not impossible to obtain. The same result may occur when interest rates and the transactional costs of obtaining new financing are high, making it economically unfeasible for the buyer to acquire a new loan. When economic conditions are such that new financing is either unavailable or economically unfeasible, the seller and buyer will normally agree to a form of financing arrangement wherein the buyer will assume the seller's loan. In such circumstances, if the lender is unwilling to permit assumption of the existing loan, and instead elects to enforce the due-on-sale clause, transfer of the property may be prohibited entirely, because the buyer will be unable to substitute a new loan for the loan being called due, and the seller will not receive an amount from the buyer sufficient to discharge that loan, particularly when the balance due is substantial. [Citation.] Even when the lender is willing to waive its option to accelerate in return for the assumption of the existing loan at an increased interest rate, an inhibitory effect on transfer may still result. The buyer, faced with the lender's demand for increased interest, may insist that the seller lower the purchase price. The seller would then be forced to choose between lowering the purchase price and absorbing the loss with the resulting reduction in his equity interest, or refusing to go through with the sale at all. In either event, the result in terms of a restraint on alienation is clear. (See Note, *Judicial Treatment of the Due-On-Sale Clause: The Case for Adopting Standards of Reasonableness and Unconscionability* (1975), 27 Stan.L. Rev. 1109, 1113.)"

Hence, it is clear to me that the enforcement of the due-on-sale clause under the instant circumstances constitutes an unreasonable restraint on alienation. Here, there is no assertion that the lender's degree of risk is increased due to the lesser creditworthiness of the Lakes, or that there is any danger of waste to the property. Rather, the lender is blunt to argue that it should be allowed to recoup from either the Lakes or the Norfleets a sum sufficient to insulate it from its poor judgment in originally lend-

ing at what it now perceives as too small an interest rate. Therefore it should be allowed to earn a return on its investment closer to or equal to the now-going interest rate.

It cannot be gainsaid that the instant deed of trust, and indeed almost all similar transactions, constitute contracts of adhesion much like contracts of insurance. The borrower is economically disadvantaged; he is not able to "shop around" to other institutions who, in any case, will demand the same provisions; the documents are drafted by and are standard with lending institutions; the due-on-sale clause is hidden away in the body of the document and seldom, if ever, called to the attention of, or the impact thereof explained to, the borrower; in contrast with other times and with other types of contracts, the borrower rarely consults an attorney regarding the legal impact of the contract; and lastly but importantly, because of superior economic knowledge in planning, the lender understands while the buyer does not that the lender anticipates that it will gain a considerable economic advantage if, as demonstrated by its averages, the properties will turn over every five to seven years.

The majority here adopts the "reasoning" of *Fidelity Federal, supra,* wherein it is asserted that allowing lending institutions to prevent sales by their enforcement of due-on-sale clauses will somehow make more mortgage money available. Such is, of course, fatuous nonsense. As in the instant case, if the new buyers are allowed to assume the seller's obligation, the entire indebtedness will not be paid off nor will the lending institution be allowed to reloan those moneys, but rather the bank will simply extract from the new buyers a monthly increase in the amount of interest. Some argument is also made regarding the poor secondary market for mortgages. If that indeed is the case, it is a sad commentary that federal agencies such as the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association, which are purportedly concerned with the public interest, not only permit but require due-on-sale clauses. Last, but not least, is

the suggestion advanced in *Fidelity Federal, supra,* that state-chartered lending institutions in the state suffered substantial losses by reason of the elimination of due-on-sale clauses in *Wellenkamp, supra.* In my opinion, that assertion demonstrates only the ability of the court to seize upon and adopt, without examination, statements put forth by parties who admittedly have a large stake in the outcome of litigation such as *Wellenkamp* and the present case. If the lending institutions did indeed sustain a loss, and if that loss is attributable to elimination of the due-on-sale clauses, it is probative of one thing and one thing alone, *i.e.,* that the institutions were no longer able to obtain that large amount of money from unwary borrowers or their assignees. It tells absolutely nothing as to whether the due-on-sale clause should, as a matter of policy, remain part of our economic scene. It states only that, if an institution has profitably engaged in unconscionable practices and is forbidden to do so, its business will not no longer be quite as profitable.

The proper holding in the instant case is that which has been reached not only in *Wellenkamp* but in other jurisdictions, *i.e.,* that the acceleration clause is an unreasonable restraint, unless there is a clear showing that enforcement is necessary to protect the lender's security. *See Patton v. First Fed. Sav. & Loan Ass'n,* 118 Ariz. 473, 578 P.2d 152 (1978); *Bellingham First Federal Savings & Loan Association v. Garrison,* 87 Wash.2d 437, 553 P.2d 1090 (1976); *Sanders v. Hicks,* 317 So.2d 61 (Miss.1975); *United States v. Angel,* 362 F.Supp. 445 (E.D.Pa. 1973); *Baltimore Life Insurance Co. v. Harn,* 15 Ariz.App. 78, 486 P.2d 190 (1971); *Clark v. Lachenmeier,* 237 So.2d 583 (Fla. App.1970). *Cf.* I.C. § 28–1–208.

As stated in *Continental Fed. Sav. & Loan Ass'n v. Fetter,* 564 P.2d 1013, 1018 (Okl.1977), "Whatever restraint is larger than the necessary protection of the party can be of no benefit to either; it can only be oppressive, and if oppressive[,] it is, in the eye of the law, unreasonable." I again insist that what is at issue here is the proper public policy for the State of Idaho

in its law of conveyancing and its law regarding the equity powers of our courts in foreclosure proceedings. It is clear from our state's strict regulation of banking, saving and insurance institutions that they must be conducted in conformance with public interest. Here, it is asserted that such institutions need have no concern for anything but their own profitability and that whatever results flow from these transactions are risks to be assumed by the public. I disagree. In a time of increasing interest cost, the borrower finds himself unable to convey unless an interest premium is paid. In a time of falling interest, a borrower is prevented from refinancing by obtaining a loan at lower interest and paying off the original loan without likewise paying the original lender a premium/penalty for prepayment. The home owner is placed at the mercy of forces he does not understand and cannot control or plan against. I find it nothing short of incredulous that such practices and procedures can be viewed as in the "public interest."

BISTLINE, Justice, dissenting.

Almost thirty years ago two young attorneys, each with but five years of experience, confidently argued to this Court, then comprised of Justices Taylor, Porter, Givens, Thomas and Keeton, that penalties under the guise of liquidated damages in executing real estate purchase contracts were in fact penalty and hence against public policy and should be so declared. The confidence so placed was not in the ability of counsel, but rather confidence in that Court. That confidence was not misplaced. *Graves v. Cupic*, 75 Idaho 451, 272 P.2d 1020 (1954). Presented with the opportunity to rule on the practice of enforcing forfeitures or penalties against defaulting contract debtors, under whatever guise, this Court, as then constituted, was unanimous in declaring that "the provision is for a penalty and is unenforceable", and "arbitrary and bears no reasonable relation to the damages which the parties could have anticipated ...." 75 Idaho at 459, 272 P.2d at 1025.

Today the same Supreme Court, differently constituted one may be certain, disdains the opportunity to continue with the holding and philosophy of the *Graves-Cupic* Court and its *Graves-Cupic* doctrine which has now been followed for thirty years.

The contractual provision which is here at issue is readily comprehended. It allows the lender at its whim and fancy, to exact the penalty of increasing the interest rate by two percent in any event where the borrower does anything with his property other than remain in it. Ostensibly it is aimed primarily at sales subject to existing encumbrances, but its sweep is unlimited. Such provisions were unknown in the days of *Graves v. Cupic*, but there should be little doubt in the minds of anyone but that the five justices above named would have made short shrift thereof. Not only do times change, but courts change. Nonetheless, courts leave behind them the case law which they have made. I had always thought, until recent years at least, it was as incumbent upon supreme courts, as it is on district courts and magistrate courts, to adhere to case law, or overrule it.

It takes little reflection to see that the provision allowing the lender to unilaterally raise the interest charge two percent upon a transfer of the security real estate is nothing but a penalty. On the face of the instrument is nothing whatever attempting to justify the provision. It is facially an arbitrary provision, an unconscionable penalty. Applied it is an unconscionable penalty, capriciously inserted in the instrument, not bargained for, and arbitrarily imposable. The California Supreme Court in a case which is somewhat a hybrid of *Graves v. Cupic* and this case held unanimously:

"We believe, however, that whatever dangers of this nature might be deemed to exist *in the abstract,* they do not justify the *blanket* restraint on alienation which the automatic enforcement of 'due-on' clauses with respect to installment land contracts would involve. It is to be emphasized in this respect that in the case of the installment land contract the vendor retains legal title until the pur-

chase price has been fully paid. Thus in the normal case the vendor, having received a small down payment and retaining legal title, has a considerable interest in maintaining the property until the total proceeds under contract are received; in this he differs markedly from the vendor of property where there has been an outright sale.

"It is true, of course, that from the point of view of the holder of the first lien, this interest of the trustor-vendor in the maintenance of the subject property cannot be fully equated within the interest of the trustor-vendor who *himself* remains in possession. It is also true that the former type of interest tends to decrease as the vendee's equity in the property increases through continued payments. But these factors do not in themselves justify the oppressive restraint on alienation which would result from automatic enforcement of the 'due-on' clause whenever an installment land contract affecting the security is entered into.[8]

"For the foregoing reasons we hold that a 'due-on' clause contained in a promissory note or deed of trust is not to be enforced simply because the trustor-obligor enters into an installment land contract for the sale of the security. Rather, in such a case the clause can be validly enforced only when the beneficiary-obligee can demonstrate a threat to one of his legitimate interests sufficient to justify the restraint on alienation inherent in its enforcement. Such legitimate interests include not only that of preserving the security from waste or depreciation but also that of guarding against what has been termed the 'moral risks' of having to resort to the security upon default. (See Hetland, Real Property and Real Property Security: The Well-Being of the Law (1965) 53 Cal.L.Rev. 151, 170; see also Cal.Real Estate Secured Transactions, *supra,* § 4.56, p. 184.) Thus, for example, if the beneficiary can show that the party in possession under the installment land contract is, or is likely to be, conducting himself with respect to the property in a manner which will probably result in a significant wasting or other impairment of the security, he may properly insist upon enforcement of the 'due-on' clause. Similarly, if the beneficiary can show that the prospects of default on the part of the vendor (requiring the inconvenience of resort to the security) are significantly enhanced in the particular situation, such circumstances might constitute a sufficient justification for enforcement of the clause despite its restraining effect.[9] Other legitimate interests of the lender may have a similar effect.[10]

"In the instant case defendants sought automatic enforcement of the 'due-on' clause. They made no effort to demonstrate how the installment land contract entered into between plaintiffs and the Nolls impinged upon their legitimate interests to an extent which would justify enforcement of the clause in the particular circumstances of the case.[11] Nor did they attempt to show that the arrangement in any way endangered their primary recourse to plaintiffs for payment of their note.[12] The trial court properly concluded that in these circumstances defendants' purported exercise of the 'due-on' clause was an unreasonable restraint on alienation within the meaning of section 711 of the Civil Code and therefore a legal nullity.".

---

[8] Indeed the beneficiary's asserted concern that the trustor himself remain in possession in order to prevent waste and depreciation seems somewhat exaggerated in view of the fact, reflected in footnote 4, *ante,* that the "due-on" clause is not normally exercised when the subject property is leased to another by the trustor. (See Cal.Real Estate Secured Transactions, *supra,* § 4.61, pp. 187–188.) The facts at bench, wherein the subject property was leased upon purchase to the very parties who later become vendees under the installment land contract, provide a case in point.

[9] In this respect the mere fact that the vendee under the installment land contract is not so good a credit risk as the trustor-vendor, while significant, would not be in itself determinative. As long as the trustor-vendor's equitable interest in the security remains significant, he retains a real incentive to prevent default, and the credit standing of his vendee would not afford sufficient justification for en-

forcement of the "due-on" clause. However, as the trustor-vendor's equitable interest diminishes through payment by the vendee, his incentive to prevent default—as well as his incentive to prevent damage to or waste of the security—also diminishes, until the moment when his entire equitable interest has passed to the vendee. At this point the propriety of enforcing the clause is clear. The trustor-vendor will now have been provided with the means to discharge the balance secured by the trust deed, so that the quantum of actual restraint on alienation caused by enforcement at this point will be minimal. Moreover, the beneficiary will no longer have the benefit of the built-in incentive to prompt payment and preservation of the property which the trustor-vendor's equitable interest provides. Accordingly, in a normal case the lender will be permitted to insist on enforcement of the "due-on" clause when the trustor-vendor's entire equitable interest in the security has passed to the vendee.

[10] We reject the suggestion that a lender's interest in maintaining its portfolio at current interest rates justifies the restraint imposed by the exercise of a "due-on" clause upon the execution of an installment land contract. Whatever cogency this argument may retain concerning the relatively mild restraint involved in the case of an outright sale (a matter to which we do not now address ourselves— see fn. 7, *ante*), it lacks all force in the case of the serious and extreme restraint which would result from the automatic enforcement of "due-on" clauses in the context of installment land contracts.

[11] Among the trial court's findings of fact were the following: "XIII. The defendants made no investigation on regarding the Nolls to determine whether or not they were good loan risks, whether or not they were laying waste to the property or whether or not their security was in fact endangered in any respect by the Contract of Sale entered into between the plaintiffs and the Nolls. . . ."

[12] The trial court found: "XV. The transaction between the Nolls and the plaintiffs in no way impaired the defendants' security, and in fact it enhanced the defendants' security because the plaintiffs retained a substantial equitable interest in the property. Prior to the execution of the Contract of Sale, the defendants had four people to look to for the payment of the obligation secured by the Deed of Trust. Once a Contract of Sale had been entered into, the defendants had six people who had a substantial interest in seeing to it that the payments under the note and Deed of Trust were made as required."

*Tucker v. Lassen Savings and Loan Ass'n,* 12 Cal.3d 629, 116 Cal.Rptr. 633, 526 P.2d 1169, 1174–76 (1974).

That case was a forerunner to *Wellenkamp v. Bank of America,* 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970 (1978), the rationale of which has no appeal to the majority of this Court—notwithstanding that a majority of the Court on occasion has been so enamored of California decisions that in *Leliefeld v. Johnson,* 104 Idaho 357, 659 P.2d 111 (1983), it relied on the rationale of two overruled California decisions to attain the result apparently deemed best.

Of course, one ought not be critical of an Idaho court for being more impressed with the writings of the High Court in *Fidelity Federal Savings & Loan Ass'n v. De La-Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Just as recently as ten days ago this Court foresook its own body of criminal law in search and seizure in order to embrace the High Court's "totality of circumstances" newly conceived in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *State v. Lang,* 105 Idaho 683, 672 P.2d 561 (1983).

I thought then, and say again, that this Court should maintain the degree of intellect and integrity of opinion for which it was noted in earlier years. Nothing whatever commands that this Court determine public policy in accordance with the views of the High Court. Today, as in *Lang,* the Court again dances to the federal fiddle. At the same time, without overruling prior case law, it blithely puts its stamp of approval on arbitrary provisions of contracts imposing penalties. In my view, the people of Idaho are entitled to opinions which, like legislative enactments, give proper regard to what has previously been declared to be the rule in Idaho.