788 P.2d 1289

**Albert J. and Sharon L. BRUNO, husband and wife, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF BOISE, now known as United First Federal Savings & Loan Association, a federally chartered savings and loan association, Defendant–Respondent.**

No. 16714.

Supreme Court of Idaho.

May 16, 1989.

ORDER DENYING PETITION
FOR REHEARING

The Appellants having filed a PETITION FOR REHEARING on February 9, 1989, and supporting BRIEF on February 23, 1989, of the Court's Opinion entered January 19, 1989, 115 Idaho 1104, 772 P.2d 1198; therefore, after due consideration,

IT IS HEREBY ORDERED that Appellant's PETITION FOR REHEARING be, and hereby is, DENIED and the dissent on Denial of the Petition for Rehearing by BISTLINE, J., be, and hereby is, RELEASED.

BISTLINE, Justice, dissenting On Denial Of Plaintiffs' Petition For Rehearing.

The rules of this Court require two votes for the granting of a petition for rehearing. As I have on many occasions said as to obtaining the grant of a petition for review of a decision of the Court of Appeals,

where three votes to grant are required, it is not easy to secure three votes from five justices, and it is well-nigh an impossibility to squeeze three votes out of but four justices, which was formerly[1] the case where one member of the Court had disqualified himself. Here the petitioners are required to obtain two votes in order to have a rehearing. My vote is the only vote for rehearing. A second vote necessarily must come from one of the three members who constitute the majority of three. Such third vote has not been forthcoming. This seemingly indicates confidence in the opinion affirming the district court. This would be an acceptable state of affairs, provided, however that some of that majority would deign an attempt at authoring an opinion explaining wherein the brief which supported the petition fails to argue persuasively that this Court should review what it has done. Moreover, on other occasions, the bare circumstance that an appeal has been decided by only four members of the Court has been given due consideration in granting a petition. In the highly unusual circumstances attendant to this case, Justice Bakes and myself were the only regular members of the Court who participated. Or, otherwise put, Justice Shepard, who defined "novation," and who also wrote a scholarly dissenting opinion in *Lake v. Equitable Savings & Loan Ass'n*, 105 Idaho 923, 927, 674 P.2d 419, 423 (1983), and who also was a participant in the unanimous opinion in *O'Boskey v. First Federal Savings & Loan Ass'n*, 106 Idaho 339, 678 P.2d 1112 (1984), was not available when this *Bruno* case, a sequel to *O'Boskey*, came up for oral argument.

Justice Shepard wrote in *Lake v. Equitable* an expose which is highly applicable in this *Bruno* case, and which certainly guided us in *Bruno*. In *Lake v. Equitable* he wrote:

I am required to dissent because I believe the opinion of the majority fails to address the public policy question presented here and provides no rationale whatsoever for the decision, but rather

---

1. Repeated efforts to correct that situation finally paid dividends. By a change in the Court rules where the Court is short of being five, a *pro tem* is appointed to vote on such petitions.

contents itself with string citations and references to the specious 'reasoning' of the United States Supreme Court in *Fidelity Federal Savings & Loan Association v. De LaCuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). As has been said in another context, the lack of reasoning and rationale makes today's opinion similar to a clock which strikes thirteen: not only is the instant pronouncement suspect, but its future pronouncements will be viewed with suspicion.

I deem it important to review what is actually at issue. The lender here purports to be able to control entirely the property which stands as security for the loan. The lender, in its prepared document, forbids not only the transfer of title to the property, but also any *possession* thereof, by anyone other than the borrower. Insofar as the document is concerned, it governs all situations, is sweeping and all-inclusive. Taken literally, it prohibits the property owner from renting his property, from entering into a contract of sale, from making a gift, and perhaps even from a transfer upon his death. In short, the terms of the document cannot reasonably be viewed as anything but a complete and absolute prohibition upon the alienation of the property.

. . . .

At bottom, the instant case reduces to a question of whether Idaho courts, exercising their equitable jurisdiction in foreclosure actions, are to be bound by the provisions of a due-on-sale clause or whether they are, depending upon the circumstances, free and able to rule that such clauses are void or voidable as a matter of public policy as being unreasonable restraints on alienation or an unconscionable advantage to a lender resulting from a contract of adhesion. Put another way, the question becomes whether that contract clause, regardless of the benefit to the lender, results in widespread and adverse consequences to the general public.

It is clear that restraints on alienation are disfavored in the law. *Funk v.*

*Funk*, 102 Idaho 521, 633 P.2d 586 (1982); *Bellingham v. First Federal S. & L. Ass'n v. Garrison*, 87 Wash.2d 437, 553 P.2d 1090 (1976). 'A "restraint on alienation" is any provision in a trust or other instrument which, either by express terms or by implication, purports to prohibit or *penalize the use of the power of alienation*.' (Emphasis added.) *Black's Law Dictionary*, p. 1183 (5th ed. 1979). Simes and Smith define a restraint on alienation as follows:

'[T]he expression "restraint on alienation" refers not merely to the restriction of the legal power of alienation, but also to the restriction of alienability as a practical matter. Any provision in a deed, will, contract, or other legal instrument which, if valid, would tend to impair the marketability of property, is a restraint on alienation.' Simes and Smith, *The Law of Future Interests* § 1111 (2d ed. 1956).

*See also* Volkmer, 'The Application of the Restraints on Alienation Doctrine to Real Property Security Interests,' 58 Iowa L.Rev. 747 91973).

It does not require the application of esoteric economic principles to understand that when, in today's marketplace, an owner of real property encumbered by a mortgage or trust deed is desirous of or required to sell that property, his power of alienation is severely penalized by a due-on-sale clause. If that owner-seller has a buyer who is equally credit worthy to himself and who is willing to pay the fair value of the property and undertake the obligation of the mortgage or trust deed, assuredly, either the buyer or the seller, or both, will be penalized by the due-on-sale provision. Either the seller will be required to reduce the price of the property below the fair value, or the buyer will be forced to pay a bonus windfall to the lending institution. Usually, the former alternative will be the case. As stated in *Wellenkamp v. Bank of America*, 21 Cal.3d 943, 148 Cal.Rptr. 379, 383–84, 582 P.2d 970, 974–75 (1978):

The availability of new financing often depends upon general economic

conditions. In times of inflation, when money is "tight" and funds available for real estate loans are in short supply, new financing may be difficult, if not impossible to obtain. The same result may occur when interest rates and the transactional costs of obtaining new financing are high, making it economically unfeasible for the buyer to acquire a new loan. When economic conditions are such that new financing is either unavailable or economically unfeasible, the seller and buyer will normally agree to a form of financing arrangement wherein the buyer will assume the seller's loan. In such circumstances, if the lender is unwilling to permit assumption of the existing loan, and instead elects to enforce the due-on-sale clause, transfer of the property may be prohibited entirely, because the buyer will be unable to substitute a new loan for the loan being called due, and the seller will not receive an amount from the buyer sufficient to discharge that loan, particularly when the balance due is substantial. [Citation.] Even when the lender is willing to waive its option to accelerate in return for the assumption of the existing loan at an increased interest rate, an inhibitory effect on transfer may still result. The buyer, faced with the lender's demand for increased interest, may insist that the seller lower the purchase price. The seller would often be forced to choose between lowering the purchase price and absorbing the loss with the resulting reduction in his equity interest, or refusing to go through with the sale at all. In either event, the result in terms of a restraint on alienation is clear. (See Note, *Judicial Treatment of the Due–On–Sale Clause: The Case for Adopting Standards of Reasonableness and Unconscionability (1975), 27 Stan.L.Rev. 1109, 1113.*)

*Lake v. Equitable Sav. & Loan Ass'n.,* 105 Idaho 923, 927–29, 674 P.2d 419, 423–25 (1983).

As the Court's opinion of January 19, 1989, discloses, Judge Theron Ward did not participate therein, because of his death in February 1988. He had not seen the opinion authored by Walters, J., Pro Tem, and joined by Bakes, J., and McFadden, J. (retired) Pro Tem. However, Judge Ward would not have joined that opinion had he seen it. The writing of the opinion for the Court was assigned to Judge Ward, and my recollection is that he had an opinion in our hands within ten or twelve days of oral argument. That opinion disclosed his thorough knowledge of the definition of a novation, and was largely the basis for my opinion pointing out that as to the theory of novation, there was not one.

The pivotal issue to the Court on Bruno's appeal was the challenge to the district court's determination that a novation had occurred, thus making this case somehow distinguishable from *O'Boskey.* That was primarily the subject of discussion, both in the brief and at oral argument.

Novation, novation, novation, novation, novation. Find that word mentioned anywhere in the opinion which Justice Pro Tem Walters has authored, and win a substantial award. That word simply does not appear in the opinion. That issue has been again addressed in the Bruno's brief on petition for rehearing. Again, no response.

The majority are content to remain silent. Supposedly each of them individually finds solace in the majority opinion which pontificates that "We find ourselves in agreement with the well-written opinion of the district court below.... We adopt the district court's rendition of the facts." Having adopted the facts, the majority opinion quickly moves on to stating the opinion of the district court, which it reports (at pages 1104, 1105, 1106, and 1107 of 115 Idaho, at pages 1198, 1199, 1200, and 1201 of 772 P.2d of the Majority Opinion) following which the majority contentedly declares that, "We agree with the analysis and determination made by the district court." Maj. Op., 115 Idaho p. 1107, 772 P.2d p. 1201.

Included therein on pages 1106 and 1107 of 115 Idaho, pages 1200 and 1201 of 772 P.2d are two paragraphs which well serve to emphasize that the majority opinion simply dodged the novation issue, but ineptly failed to observe that the very opinion of

the district court which they were approvingly quoting and implicitly adopting as their own, was predicated on the district court's perception that a novation had occurred, thus taking the Brunos out of O'Boskey's circumstance.

The defendant concedes that the due-on-sale clause contained in the Reese deed of trust might have been unenforceable under the *O'Boskey* decision. However, the parties never reached that confrontation. Instead, a new agreement was signed by the Brunos, the Reeses, and First Federal which operated to release the Reeses and substitute the Brunos as borrowers, impose the stated assumption fee, and re-amortize the loan balance at an increased interest rate. *This assumption agreement was a complete novation* [3] of the prior contractual agreements between First Federal and the Reeses, and became the controlling agreement between First Federal and the Brunos.

. . . .

In the instant case, while the plaintiffs were no doubt unhappy with First Federal's demand for an increase in interest, they did not challenge the defendant's actions as did the plaintiffs in *O'Boskey* and *Lake.* While the plaintiffs contend they were given no choice but to acquiesce in the defendant's demands, the fact remains that they did have a choice—they could have refused to agree to First Federal's terms—and proceeded without agreement as the parties did in *O'Boskey,* or agreed under protest as the parties did in *Lake,* or they could have abandoned the deal and looked elsewhere for more favorable terms. Instead of rejecting the defendant's offer the plaintiffs willingly consummated their real estate transaction with the Reeses and entered into the assumption agreement, continuing to pay thereon for some three years. In exchange for the promises of the Brunos, First Federal released the Reeses from their obligations. *A novation occurred wherein the Brunos 'stepped into the shoes' of the Reeses*

*and First Federal henceforth looked exclusively to the Brunos to satisfy the loan obligations.*

---

[3] A novation has been characterized as a species of accord and satisfaction, consisting of two stipulations: first, to extinguish an existing obligation and, second, to substitute a new one in place of the original. *Harris v. Wildcat Corporation,* 97 Idaho 884, 886, 556 P.2d 67, 69 (1976), *following Wheeler v. Wardell,* 173 Va. 168, 3 S.E.2d 377 (1939).

*Bruno v. First Federal Savings & Loan Association of Boise,* 115 Idaho 1104, 1106, 772 P.2d 1198, 1200 (1989). When the majority opinion took that particular route to affirm, i.e., adopting the district court's opinion, it unwittingly acknowledged that novation was crucial to that opinion, and thus the majority are guilty of attempting to dodge the issue upon which the district court reached its contra *O'Boskey* decision, and moreover, the majority are found out. That much we can readily see. What we cannot understand however, are the why and wherefores of doing so.

Novation was the very point on which the district court decided the case. This was diligently challenged on the appeal. Judge Ward addressed it. I addressed it. It is again addressed on the petition and brief seeking a rehearing—a rehearing at which both Justice Shepard and Justice Huntley would be available.[2]

Much of what Justice Shepard wrote in *Lake v. Equitable,* 105 Idaho 923, 674 P.2d 419 (1983), is applicable in this case, and is a complete response and criticism of the district court's facile rationale under which he found fault on the part of the Brunos for being so easily led into succumbing to United First Federal's wiles:

> While the plaintiffs contend they were given no choice but to acquiesce in the defendant's demands, the fact remains that they did have a choice—they could have refused to agree to First Federal's terms—and proceeded without agreement as the parties did in *O'Boskey,* or agreed under protest as the parties did in *Lake,* or they could have abandoned the

---

**2.** Recently in a PUC case where Justice McFadden had participated, he forthrightly voted for a

rehearing, knowing that he would not thereafter be required to sit.

deal and looked elsewhere for more favorable terms. Instead of rejecting the defendant's offer the plaintiffs willingly consummated their real estate transaction with the Reeses and entered into the assumption agreement, continuing to pay thereon for some three years.

*Bruno v. First Federal Savings & Loan Association of Boise,* 115 Idaho 1104, 1107, 772 P.2d 1198, 1201 (1989).

Justice Shepard in his *Lake v. Equitable* opinion saw the situation more realistically than did the district court in the Brunos' case. Judge McKee's flimsy reason for holding against them was, in the final instance, "or they could have abandoned the deal and looked elsewhere for more favorable terms." If that was intended to mean that they could have searched out a more lenient moneylender, then it was a meaningless alternative. Nothing in the record suggests that other money at the same or similar terms was available.

If it was meant to say that Mr. & Mrs. Bruno should have looked elsewhere for their new home in Boise, it was equally meaningless—albeit a possibility. The Brunos wanted to buy the Reese property, and why shouldn't they be able to do so? Only because the "due-on-sale" clause stood in the way, making the case clearly reviewable in light of what Justice Shepard so adroitly pointed out quoting from *Wellenkamp v. Bank of America,* 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970 (1978), in *Lake v. Equitable Savings & Loan,* was an unconscionable restraint on trade:

> The availability of new financing often depends upon general economic conditions. In times of inflation, when money is "tight" and funds available for real estate loans are in short supply, new financing may be difficult, if not impossible to obtain. The same result may occur when interest rates and the transactional costs of obtaining new financing are high, making it economically unfeasible for the buyer to acquire a new loan. When economic conditions are such that new financing is either unavailable or economically unfeasible, the seller and buyer will normally agree to a form of financing arrangement wherein the buyer will assume the seller's loan. In such circumstances, if the lender is unwilling to permit assumption of the existing loan, and instead elects to enforce the due-on-sale clause, transfer of the property may be prohibited entirely, because the buyer will be unable to substitute a new loan for the loan being called due, and the seller will not receive an amount from the buyer sufficient to discharge that loan, particularly when the balance due is substantial. [Citation.] Even when the lender is willing to waive its option to accelerate in return for the assumption of the existing loan at an increased interest rate, an inhibitory effect on transfer may still result. The buyer, faced with the lender's demand for increased interest, may insist that the seller lower the purchase price. The seller would often be forced to choose between lowering the purchase price and absorbing the loss with the resulting reduction in his equity interest, or refusing to go through with the sale at all. In either event, the result in terms of a restraint on alienation is clear. (See Note, *Judicial Treatment of the Due-On-Sale Clause: The Case for Adopting Standards of Reasonableness and Unconscionability (1975), 27 Stan.L. Rev. 1109, 1113.*)

*Lake v. Equitable Sav. & Loan Ass'n.,* 105 Idaho at 929, 674 P.2d at 425 (1983).