# MCA TELEVISION LIMITED v AMERICAN COMMUNICATIONS, et al.

## Case No. 86-3199-CA

Eighth Judicial Circuit, Alachua County, Florida

January 18, 1988

## OPINION OF THE COURT

CHESTER B. CHANCE, Circuit Judge.

### ORDER AND OPINION REGARDING THE ENFORCEABILITY OF LICENSING AGREEMENTS AND GUARANTEES *FREELY ENTERED INTO AMONG THE PARTIES*

Plaintiff, MCA TELEVISION, LIMITED (hereinafter "MCA"), isa syndicator of a wide variety of television series and film programming to independent and network affiliated television stations across the country. Defendant, OGDEN TELEVISION, INC. (hereinafter "Ogden"), a Florida corporation which operates KOOG-TV in Ogden, Utah, and Hilton Head Television, Inc. (hereinafter "Hilton Head"), a

South Carolina corporation operating WTGS-TV in Hardeeville, South Carolina, executed forty-two (42) licensing agreements with MCA during 1985 and 1986. Ogden and Hilton Head are wholly owned subsidiaries of Defendant, AMERICAN COMMUNICATIONS AND TELEVISION, INC. (hereinafter "ACTV"), a publicly owned and traded Florida corporation which guaranteed Ogden's and Hilton Head's financial commitments pursuant to many of the licensing agreements.

This lawsuit was commenced because Defendants had defaulted on these licensing agreements. Subsequent to MCA's filing of this action, ACTV and Ogden moved this Court for a hearing on their claim that the various agreements and guarantees entered into among the parties were unconscionable and hence unenforceable. Thereafter, this Court considered the merits of the action on the licensing agreements. This Court finds that the licensing agreements and guarantees are fully enforceable under California law. Defendants' claim that the licensing agreements and guarantees, or any part of them, are unconscionable is specifically rejected. Instead, MCA is entitled to receive from ACTV and its subsidiaries all damages provided in the licensing agreements, including liquidated damages, totalling $1,471.054.45. Under the terms of the guarantees, ACTV is legally responsible for payment of the entire amount due.

## I. THE LICENSING AGREEMENTS CHALLENGED BY DEFENDANTS AT BAR ARE NOT UNCONSCIONABLE UNDER CALIFORNIA LAW[1]

Before a contract will be stricken as unconscionable under controlling California authorities, two conditions must co-exist: (1) there must be an absence of any meaningful choice on the part of one of the contracting parties, and (2) the substantive terms of the contract must be unreasonable skewed in favor of the other party. *E.g., A&M*

---

[1] California law controls this case. The licensing agreements which had been entered into among the parties specifically provide that the agreements shall be governed, construed and enforced in accordance with California law. It is axiomatic that when parties stipulate as to the law which is to govern their agreement, such stipulation will control. *E.g., Department of Motor Vehicles v. Mercedes-Benz of North America, Inc.,* 408 So.2d 627, 629 (Fla. 2d DCA 1981), *modified,* 455 So.2d 404 (Fla.2d DCA 1984), *petition for review denied,* 462 So.2d 1107 (Fla. 1985); *Hirsch v. Hirsch,* 309 So.2d 47 (Fla. 3d DCA 1975). Further, the connection of the licensing agreements to California is clear; MCA's main headquarters are located in California, the contracts were executed and accepted by MCA in California, programming prints and schedules were developed in California, and all payments under the licensing agreements were to be sent to MCA in California.

*Produce Company v. FMC Corporation,* 186 Cal. Rptr. 114, 121 (Cal. Ct. App. 1982). Stated alternatively, unconscionability requires both a "procedural" and a "substantive" element. *Id.*

"Procedural unconscionability requires the challenging party to demonstrate both "oppression" and "surprise". *Id. This exists where the relative bargaining power of the parties is so distorted that no real negotiation can be had. Id.* at 122. "Surprise" focuses on the extent to which terms of the bargain are concealed in a prolix printed form prepared by the party seeking to enforce the challenged terms. *Id.* "Substantive" unconscionability requires a finding of not only a "one-sided" result, but also an absence of any justification for it. *Id.* Both procedural and substantive unconscionability must exist before a court can be justified in exercising portions of an agreement. *Id. at 121; Central Bank v. Kaiperm San Clara Federal Credit Union,* 236 Cal. Rptr. 273-74 (Cal. Ct. App. 1987), *Chretian v. Donald L. Bran Company,* 198 Cal. Rptr. 523, 525 (Cal. Ct. App. 1984).

Moreover, as noted by the Court in *A&M,*

> the mere fact that a contract term is not read or understood by the non-drafting party or that the drafting party occupies a superior bargaining position will not authorize a court to refuse to enforce the contract.

A. *Defendants' advantageous bargaining position, demonstrated ability to negotiate contractual concessions and comprehension of the plan term set forth in the parties' licensing agreements preclude any finding of "procedural" unconscionability.*

The evidence at trial demonstrated that the market for television programming was one in which buyers, and not suppliers, were in the driver's seat. Broadcasters—and independent broadcasters in particular—find themselves courted by the 150 to 200 programming syndicators located throughout the country. Within this group, there are 10 to 12 "major" programming syndicators of comparable stature to MCA. There exists an abundance of programming available from numerous syndicators, and defendants had the opportunity and ability to pick and choose precisely the mix and extent of programming they wanted. Having so exercised their freedom of choice, Defendants cannot now complain that they were force-fed programming on a take-it-or-leave-it basis. The facts simply do not bear this out; on the contrary, this Court finds that Defendants possessed significant leverage which enabled them to exact concessions from MCA on the deals that were ultimately negotiated. In fact, many of the MCA deals were renegotiated not only once, but two or more times.

104

Moreover, this was not a case in which an unwary consumer was hoodwinked into making an oppressively one-sided deal. It is essential to underscore the fact that MCA licensing agreements and guarantees at issue here are easy to read and readily comprehensible. Unlike some other syndicator contracts introduced as evidence at trial, MCA's contracts are multi-page documents prepared in normal, easy to read typeset. There are no microscopic boilerplate paragraphs squeezed onto a one page agreement. Additionally, Defendants had the full opportunity to study the terms of the various agreements as well as have them analyzed by counsel.

In sum, this Court finds that the agreements executed among the parties were not at all tainted by "procedural" unconscionability. And, absent a finding of "procedural" unconscionability under the facts at bar, Defendants cannot prevail under California law. As stated above, California law requires that a challenged contract be both "procedurally" and "substantively" unconscionable before it will be stricken or portions of it excised. *E.g., A&M Produce Company v. FMC Corporation,* 186 Cal. Rptr. 114, 121 (Cal. Ct. App. 1982); *Chretian v. Donald L. Bren Company,* 198 Cal. Rptr, 523, 525 (Cal. Ct. App. 1984).[2] Thus, this Court finds the various agreements and guarantees—untainted by "procedural" unconscionability—are enforceable under California law.

B. *The substantive terms of the parties' licensing agreements and guarantees challenged at bar are not oppressive and unreasonable, but are in fact supported by commercial realities in the syndicated programming market. Moreover, every provision in MCA's agreements which Defendants challenge as unconscionable has been upheld by California courts.*

The California case authorities require that the issue of a contract's substantive unconscionability be analyzed in terms of: (1) whether

---

[2] *Accord, Perdue v. Crocker National Bank,* 216 Cal. Rptr. 345 (Cal. 1985) (In Bank) (finding that signature card drafted by the bank and offered to customers without negotiation qualified as "procedurally" unconscionable and that sufficient facts were alleged regarding the signature cards' alleged "substantive" unconscionability necessitated a hearing on plaintiffs' unconscionability claim pursuant to Section 1670.1(b) of the California Civil Code; thence, the Supreme Court reversed the judgment of dismissal which had been predicated on lower court's sustaining of hearing); *Graham v. Scissor-Tail, Inc.,* 171 Cal. Rptr. 604 (Cal. 1981) (In Bank) (Supreme Court holds that where form contract was tendered to music promoter on a "take it or leave it" basis and contained an arbitration provision which failed to meet "minimum levels of integrity" and had served to deprive the promoter of the possibility of a fair hearing on any disputes brought under the contract, both "procedural" and "substantive" unconscionability existed to warrant the invalidation of the contract).

oppressive, "one-sided" results exist, *and* (2) whether there is an absence of commercially legitimate justifications for such results. *E.g., A&M Produce Company,* 186 Cal. Rptr. at 122 (citation omitted). The focus of Defendants' argument is that the licensing agreements are substantively unconscionable because they provide for acceleration of all payments due under the contracts upon breach, and because they contain cross-default provisions. This Court concludes that the licensing agreements and guarantees are not oppressive, and further finds that the terms and requirements contained in those agreements are supported by compelling, legitimate business considerations. The very aspects of the default provisions which Defendants challenge here have all been upheld by the California courts and are supported by the clearly enunciated and compelling public policy embodied in Section 1671(b) of the California Civil Code.

1. Acceleration.

By invoking its acceleration remedies under the licensing agreements, MCA merely seeks the benefit of its bargain. This result is amply supported by the California case law. For example, in *Stewart v. Claudius,* 19 Cal. App. 2nd 349, 354, 65 P.2d 933 (1937), the court held that where a father contracted to pay his son's school tuition for an entire year and the son was dismissed for good cause before the school year had elapsed, the school was entitled to recover all remaining installments of the tuition which the father had agreed to pay despite the fact that his son had not been allowed to finish out the year.

This Court believes that MCA's exercise of its acceleration remedies should not be treated any differently. Acceleration clauses are based on legitimate and reasonable commercial grounds. Such a clause allows the injured party to commence a single action for breach of the entire agreement, rather than being forced to institute multiple actions as each payment becomes due. Thus, acceleration clauses advance the interests of judicial economy as well as commercial practicality by avoiding repetitive, unnecessarily fragmented litigation.

Acceleration clauses have been upheld in every jurisdiction in the United States,[3] and have long been deemed enforceable under Califor-

---

[3] *American Nat. Bank and Trust Company v. Robertson,* 384 So.2d 1122 (Ala. Civ. App. 1980); *Bowers v. Alaska State Employees Federal Credit Union2rf, 670 P.2d 1145 (Alaska 1983); Frei v. Hamilton,* 123 Ariz. 544, 601 P.2d 307 (Ariz. App. 1979); *First South Federal Savings and Loan Association v. Indiandale Manor Company,* 8 Ark. App. 115, 648 S.W.2d 840 (Ark. App. 1983); *Tan v. California Federal Savings and Loan Association,* 140 Cal. App.3rd 800, 189 Cal. Rptr. 775 (Cal. App. 4 Dist.

1983); *Krause v. Columbia Savings and Loan Association*, 632 P.2d 1158 (Colo. App. 1981); *Hartford Federal Savings and Loan Association v. Tucker*, 196 Conn. 172, 491 A.2d 1084 (Conn. 1985); *United States Savings Bank of Newark, New Jersey v. Continental Arms, Inc.*, 338 A.2d 579 (Del. Super. 1975); *Har-Rich Realty Corp. v. American Consumer Industries, Inc.*, 351 F.2d 785, 122 U.S. App. D.C. 88 (D.C. Cir. 1965); *Freedom Savings and Loan Association, Inc. v. Lamonte*, 448 So.2d 51 (Fla. App. 2 Dist. 1984); *Military Armament Corp. v. ITT Telephone Corp.*, 134 Ga. App. 694, 215 S.E.2d 724 (Ga. App. 1975); *Tryck, Nyman and Hayes, Inc. v. Ficke*, 591 P.1d 104, 60 Hawaii 413 (Haw. 1979); *Lake v. Equitable Savings and Loan Association*, 674 P.2d 419, 105 Idaho 923 (Idaho 1983); *Baker v. Loves Park Savings and Loan Association*, 61 Ill.2d 119, 333 N.E.2d 1 (Ill. 1975); *McEntire v. Indiana National Bank*, 471 N.E.2d 1216 (Ind. App. 4 Dist. 1984); *Martin v. Peoples Mutual Savings and Loan Association*, 319 N.W.2d 206 (Iowa 1983); *Frets v. Capital Federal Savings and Loan Association*, 238 Kan. 614, 712 P.2d 1270 (Kan. 1986); *Nunnelley v. Herndon*, 685 S.W.2d 206 (Ky. App. 1985); *Taliancich v. Union Savings and Loan Association*, 142 So.2d 626 (La. App. 1962); *Chapman v. Ford*, 246 M.D. 42, 227 A.2d 26 (Md. 1967); *Dunham v. Ware Savings Bank*, 384 Mass. 63, 423 N.E.2d 998 (Mass. 1981); *Holiday Acres No. 3 v. Midwest Federal Savings and Loan Association of Minneapolis*, 308 N.W.2d 471 (Minn. 1981); *Occidental Savings and Loan Association v. Venco Partnership*, 206 Neb. 469, 293 N.W.2d 843 (Neb. 1980); *First Commercial Title, Inc. v. Holmes*, 92 Nev. 363, 550 P.2d 1271 (Nev. 1976); *Mills v. Nashua Federal Savings and Loan Association*, 121 N.H. 722, 433 A.2d 1312 (N.H. 1981); *Sentry Federal Savings and Loan Association of Bridgeton v. Van Glahn*, 144 N.J. Super. 48, 364 A.2d 558 (N.J. Super. Ch. 1976); *Ceravolo v. Buckner*, 111 Misc. 2d 676, 444 N.Y.S.2d 861 (N.Y. Sup. 1981); *Crockett v. First Federal Savings and Loan Association of Charlotte*, 289 N.C. 620, 224 S.E.2d 580 (N.C. 1976); *Northwestern Federal Savings and Loan Association v. Fargo v. Ternes*, 315 N.W.2d 296 (N.D. 1982); *Peoples Savings Association v. Standard Industries, Inc.*, 22 Ohio App.2d 35, 257 N.E.2d 406, 51 O. O.2d 43 (Ohio App. 1970); *First Federal Savings and Loan Association of Rapid City, S.D. v. Kelly*, 312 N.W.2d 476 (S.D. 1981); *Gunther v. White*, 489 S.W. 529 (Tenn. 1973); *Crestview, Ltd. v. Foremost Insurance Company*, 621 S.W.2d 816 (Tex. Civ. App. 3 Dist. 1981); *Walker Bank and Trust Company v. Neilson*, 26 Utah 2d 383, 490 P.2d 328 (Utah 1971); *Lipps v. First American Service Corp.*, 223 Va. 131, 286 S.E.2d 215 (Va. 1982); *Bellingham First Federal Savings and Loan Association v. Garrison*, 87 Wash.2d 437, 553 P.2d 1090 (Wash. 1976); *Mutual Federal Savings and Loan Association v. Wisconsin Wire Works*, 71 Wis.2d 532, 239 N.W.2d 20 (Wis. 1976); *Hartford National Bank Trust v. Harvey*, 420 A.2d 230 (Me. 1980); *Windorf v. Ferris*, 154 Mich. App. 201, 397 N.W.2d 168 (Mich. App. 1986); *Unifirst Federal Savings and Loan Association v. Tallow Loan of Mississippi*, Slip Copy (Sup. Ct. of Miss. 1986); *Whitman v. Livingston*, 541 S.W.2d 61 (Mo. App. 1976); *Stark v. Borner*, 735 P.2d 314 (Mont. 1987); *Brummund v. First National Bank of Clovis*, 99 N.M. 221, 656 P.2d 884, 45 A.L.R. 4th 403 (N.M. 1983); *Lincoln Mortgage Investors v. Cook*, 659 P.2d 925 (Okla. 1982); *Morgan v. Baunach*, 68 Or. App. 496, 684 P.2d 589 (Or.App. 1984); *Ministers and Missionaries Benefit Board of American Baptist Churches v. Goldsworthy*, 253 Pa. Super. 321, 385 A.2d 358 (Pa. Sup. 1978); *Industrial National Bank of Rhode Island v. Stuart*, 113 R.I. 124, 318 A.2d 452 (R.I. 1974); *Caulder v. Lewis*, 287 S.C. 372, 338 S.E.2d 837 (S.C. 1986); *Young v. Northern Terminals, Inc.*, 132 Vt. 125 315 A.2d 469 (Vt. 1974); *U.S. Life Credit Corp. v. Wilson*, 301 S.E.2d 169, 42 A.L.R. 4th 385 (W. Va. 1982); *Anderson v. Rocky Mountain Federal Savings and Loan Association*, 651 P.2d 269 (Wyo. 1982).

nia law. *E.g., Santa Clara Savings & Loan Association v. Pereira,* 164 Cal.App.3d 1089, 211 Cal. Rptr. 54 (Cal. Ct. App. 1985); *Leonard v. Rose,* 55 Cal. Rptr. 16, 422 P.2d 604, 65 Cal.2d 589 (Cal. 1967).

Additionally, the California legislature has expressly endorsed the use of acceleration clauses in leases or sales of real and personal property. *see,* Cal. Civ. Code, §§ 1951.2, 3308, and this public policy should likewise be given force here.

Allowing MCA to accelerate the payments due it under the contracts merely permits MCA to obtain that which it would have received in any event had Defendants lived up to their obligations. To deny MCA the right to receive all such payments would sanction a perverse result: it would penalize a party *not* in default by disallowing that party from realizing the benefit of the bargain it would have received had the defaulting party performed. *See Runyan v. Pacific Air Industries, Inc.,* 85 Cal. Rptr. 138, 2 Cal.3d 304, 466 P.2d 682 (Cal. 1970).

Of critical significance to this Court's holding is the fact that the acceleration clause at issue here is tantamount to a liquidated damages provision, and California's public policy strongly favors the enforcement of such provisions. Under California law, a liquidated damages clause is *presumptively lawful,* and a party challenging it must bear the burden of proving that it was "unreasonable" under the circumstances existing at the time the contract was made.

Section 1671(b) of the California Civil Code provides, in pertinent part, that:

[A] provision in a contract liquidating damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made.

Prior to the July 1, 1978 amendment of Section 1671(b), California case law appeared to be split on the issue of whether acceleration clauses were to be considered provisions for liquidated damages. Some courts held that acceleration clauses were not liquidated damages clauses, and accordingly enforced acceleration of the unpaid installments contractually owing. *See, e.g., Associations Discount Corporation v. Tobb Company,* 50 Cal. Rptr. 738 (Cal. Ct. App. 1966). Other courts, however, viewed acceleration clauses and liquidated damages clauses as one and the same and held them to be presumptively invalid under the predecessor version of 1671(b). *See, e.g., Ricker v. Rombough,* 261 P.2d 328 (Cal. Ct. App. 1953).

The Legislature's 1978 amendment of Section 1671(b) completely

108

reversed the presumption identified by cases such as *Rombough* against the enforceability of liquidated damages provisions. *See, e.g., Hong v. Somerset Associates,* 207 Cal. Rptr. 597, 599 (Cal. Ct. App. 1984). Liquidated damages provisions are now deemed presumptively valid unless affirmatively shown to be unreasonable. *E.g., Firemen's Fund Insurance Company v. Morse Signal Devices,* 198 Cal. Rptr. 756 (Cal. Ct. App. 1984).

An illustrative case in point is *Hong v. Somerset Associates,* 207 Cal. Rptr. 597, 161 Cal. App.3d 111 (Cal. Ct. App. 1984). There the court stressed that a party challenging a liquidated damages provision has the burden of proving that it was unreasonable under the circumstances existing at the time the contract was made. *Hong,* 207 Cal. Rptr. at 600. Finding that this heavy burden was not met in the case before it, the *Hong* court enforced a liquidated damages clause contained in a real property purchase contract. The court noted that the clause at issue had not been hidden in the contract and that the purchasers—although not in the business of buying homes—were not naive, unsophisticated people. *Hong,* 207 Cal. Rptr. at 600. Furthermore, the court emphasized the fact that the property had been taken off the market when the agreement was signed, and hence it could be presumed that the seller suffered damages by not being able to market the property to other prospective buyers.

Here, as in *Hong,* the liquidated damages clause is not hidden; it is conspicuously placed in the paragraph entitled "DEFAULTS" and is readily comprehensible. Moreover, like the situation which confronted the seller in *Hong,* MCA did not (and could not) market this programming to other stations in the affected markets once the parties had entered into their agreements. This is the heart of the issue—MCA should not be deprived of the benefit of its bargain simply because it contracted with parties who have refused to pay their bills, where MCA has been denied the ability to market this programming to other stations in Salt Lake City/Ogden and Savannah/Hilton Head.

The agreements which Defendants claim are unconscionable have been used by MCA across the country since at least 1957, and no one had ever challenged their validity until this suit was filed. This Court finds that the fact that these contracts have been in use throughout the country for some thirty years without incident is telling regarding their reasonableness.

Further, the commercial reasonableness of the liquidated damages provision is evidenced by its inclusion in other installment contracts. California courts view prevailing standards within an industry as

**109**

evidence of their reasonableness when found within the terms of an agreement. *E.g., Cubic Corporation v. Marty,* 229 Cal. Rptr. 828 (Cal. Ct. App. 1986). Defendants concede that these provisions are standard in the television syndication industry, and as has been demonstrated, Defendants are party to syndication contracts with other syndication companies that contain the same type of provisions. Further, as this Court has previously stressed, MCA's liquidated damage provision is not obfuscated in fine print on the reverse side of a preprinted contract.

If the Defendants believed that the liquidated damages clause was unreasonable, they could have either negotiated the clause out of the contract or sought financing from lending institutions to pay MCA in advance, and thereby eliminate the applicability of such a provision. Defendants admit that they made no such attempt to negotiate the liquidated damages clause out of the agreements, although evidence was offered by MCA that each and every provision in its licensing agreement was negotiable and MCA had in fact negotiated liquidated damages provisions in the past. Defendants also admit they made absolutely no attempt to obtain financing in order to pay for the desired programming in advance.

Since the California Legislature's 1978 amendment of 1671(b), there have been no cases in California refusing to enforce acceleration provisions in a liquidated damages clause. Defendants' reliance on cases decided outside of California is misplaced. These cases apply standards which place the burden of showing commercial reasonableness on the proponent of the contract, and hence are in direct and fundamental conflict with the strong California policy favoring the enforcement of liquidated damages provisions unless affirmatively demonstrated to be unreasonable.[4]

2. Cross-Default.

Regarding the cross-default provisions at issue here, MCA has also demonstrated their commercial justification on two independent grounds. First, if a party has not been able to pay on one contract, one can logically infer that they are not going to be able to pay on the remainder of their contracts. In other words, failure to pay under one agreement is a sufficient event to objectively support a belief that the prospect of payment under the remaining agreements is impaired.

---

[4] *See, Hertz Commercial Leasing Corp. v. Dynatron, Inc.,* 427 A.2d 872, 37 Conn. Supp. 7 (1980); *Fairfield Lease Corp. v. Umberto,* 7 U.C.C. Rep. Serv. (Callaghan) 1181 (N.Y. Civ. Ct. 1970); *Fairfield Lease Corp. v. Pratt,* 278 A.2d 154, 6 Conn. Cir. 537; *Bank of Indiana, N.A. v. Holyfield,* 27 U.C.C. Rep. Ser. (Callaghan) 635 (D.C. Miss. 1979).

Thus, MCA's invocation of the cross-default provision under such circumstances avoids the wastefulness in terms of time, effort and expense of having to file a lawsuit on each contract.

Second, it has been MCA's experience that some television stations pick and choose which contracts they will honor and which ones they will default. Sometimes a television station will keep programs current on which they are getting good ratings but ignore their obligation to pay for programming which has not proven as successful. By enforcing its cross-default clauses, MCA is able to prevent a situation where they are legally compelled to supply highly desirable programming to a station while having to incur significant costs in pursuing litigation against that same station regarding those contracts on which the latter has refused to make payment. (*Id.* at 165-66). MCA's cross-default provision is clearly grounded in rational business concerns, and consequently defendants' burden of demonstrating its irrational and oppressive character has not been satisfied.

The one case cited by Defendants which held a contract containing an acceleration clause and a cross-default clause to be unconscionable, *Fairfield Lease Corp. v. Pratt,* 278 A.2d 154 (Conn. Cir. Ct. 1971), is completely inapposite to the case before this Court. First of all, that case rested entirely upon the Court's analysis of a UCC provision which has no application to a case like this in which neither a "sale" nor "goods" are involved.[5] Second, the *Pratt* court approached its analysis by presuming the *in*validity of the acceleration and cross-default clauses at issue. In sharp contrast to Connecticut law, however, Section 1671(b) clearly and unequivocally enunciates California's policy of presuming the *validity* of liquidated damages absent an affirmative demonstration of their unreasonableness. Third, the facts in the *Pratt* case are totally foreign to the case before this Court. In *Pratt,* the court premised its finding of unconscionability upon the fact that even a trivial breach of a harmless condition or clause of the agreement would authorize the plaintiffs to recover all sums under the lease. By way of contract, the licensing agreements at bar allow MCA to invoke its acceleration and cross-default remedies only where a "material" breach has occurred, or other uncured breaches have occurred and Defendants have been given at least ten days to rectify them. Most importantly, in the instant case, Defendants' breaches are indisputably material—in

---

[5] *See, e.g., William B. Tanner Company v. WIOO, Inc.,* 528 F.2d 262 (3rd Cir. 1975) (Court held that the licensing of vocal and instrumental recordings to be broadcast on the air did not come within the statutory definition of "goods" pursuant to Article 2 of the UCC.).

fact, they go to Defendants' core obligation under the agreements: the failure to pay for product delivered.

3. Mitigation/Exclusivity.

Defendants also argued that the absence of explicit mitigation and exclusivity provisions in the MCA agreements rendered them unconscionable. These arguments are without merit and can be quickly disposed of. First, the agreements all expressly incorporate governing California law and hence clearly are subject to MCA's duty to mitigate damages. *See, e.g., Davies v. Krasna,* 121 Cal. Rptr. 705, 535 P.2d 1161 (Cal. 1975). At trial, MCA introduced two witnesses—William Smith and Jeff McElheney—to explain its efforts in attempting to market the programming on which Defendants had defaulted. These efforts included sales presentations made to competing stations in both the Salt Lake City/Ogden and Savannah/Hilton Head markets at conventions, pursuant to special trips to programming directors in each market, and via telephone solicitations and correspondence.

Turning next to Defendants' argument that the agreements are unconscionable because they do not explicitly provide for exclusivity, two points must be clarified: First, an agreement has never been held unconscionable in California for what it did not contain. Second, and more basic, Defendants did in fact possess exclusivity of programming as it pertained to all other television stations in their respective markets.

In sum, Defendants have been unable to carry their burden of demonstrating that the substantive terms of the licensing agreements are both oppressively "one-sided" and lack legitimate commercial justification. *A&M Produce Company v. FMC Corporation,* 186 Cal. Rptr. at 122. Moreover, as stated previously, Defendants have the burden of demonstrating both "procedural" unconscionability and "substantive" unconscionability before they can prevail in their claim. Defendants have fallen short on this burden. The MCA agreements are fair and reasonable, rationally related to legitimate business concerns, and thus enforceable.

## II. *MCA'S RECOVERABLE DAMAGES*

MCA established all the elements of its case for breach of contract. Defendants have not controverted the fact that MCA has entered into various licensing agreements and guarantees with Defendants, that Defendants are in default under these licensing agreements and guarantees, and that MCA has made demand for payment. Defendants also have stipulated that evidence introduced by MCA's counsel regarding

112

amounts billed Defendants under the various licensing agreements and guarantees, and those amounts which remain unpaid under these agreements and guarantees, are factually accurate. The only dispute which remained for this Court to resolve was the amount of damages MCA is entitled to receive in judgment. MCA argued for all accelerated sums owing to it under the various agreements and guarantees, whereas Defendants argued that MCA should receive payment for only those programs that were actually broadcast by the stations.

The measure of damages MCA is entitled to receive upon default is governed by the liquidated damages clauses in the licensing agreements. The evidence introduced at trial established that those agreements (which were subject to the parent company's guarantees) encompassed liquidated damages totalling $872,120.70 for Ogden and $598,933.85 for Hilton Head. The total of all liquidated damages regarding which ACTV guaranteed payment to MCA amounts to $1,471.054.55.

MCA fulfilled its obligations under the various licensing agreements. Defendants are obligated to pay MCA the full benefit of its bargain. Therefore, ACTV is ordered to make payment of $1,471.054.55 to MCA at this time.

DONE AND ORDERED in Chambers at Gainesville, Alachua County, Florida, this 18th day of January, 1988.